

2001 Decisions

**Opinions of the United
States Court of Appeals
for the Third Circuit**

4-17-2001

# Medtronic AVE Inc v. Advanced Cardiovascular Systems, Inc.

Precedential or Non-Precedential:

Docket 00-5230

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

## Recommended Citation

"Medtronic AVE Inc v. Advanced Cardiovascular Systems, Inc." (2001). *2001 Decisions.* Paper 80.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/80

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 17, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5230

MEDTRONIC AVE, INC.

v.

ADVANCED CARDIOVASCULAR SYSTEMS, INC.,

      Appellant

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. Nos. 98-00080, 98-00314, 98-00316)
District Judge: The Honorable Sue L. Robinson

Argued February 12, 2001

BEFORE: SCIRICA, FUENTES, and GREENBERG,
Circuit Judges

(Filed: April 17, 2001)

      Peter Buscemi (argued)
      Richard S. Meyer
      D. Michael Underhill
      John H. Williamson
      Mark A. Goodin
      Morgan, Lewis & Bockius
      1800 M Street, N.W.
      Washington, D.C. 20036

      Attorneys for Appellee

Frederick L. Cottrell, III
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Aldo A. Badini (argued)
Henry J. Ricardo
Dewey Ballantine LLP
1301 Avenue of the Americas
New York, NY 10019-6092

Richard A. Bardin
Craig B. Bailey
Fulwider Patton Lee & Utecht, LLP
10877 Wilshire Boulevard,
 10th Floor
Los Angeles, CA 90024

 Attorneys for Appellant

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter is before the court on an appeal fr om an order of the district court dated September 30, 1999, denying American Cardiovascular Systems' ("ACS") motion for a stay of patent infringement litigation pending arbitration pursuant to 9 U.S.C. S 3. ACS sought a stay in this litigation brought by Medtronic/Arterial Vascular Engineering,1 Inc. ("A VE") so that it could enforce the arbitration clauses in two agreements containing a release and a covenant not to sue, respectively, into which ACS had entered with C.R. Bard, Inc. ("Bar d"). After ACS and Bard executed these agreements, AVE, in 1998, purchased Bard's coronary catheter business. At that time Bard assigned the two agreements to AVE. A VE and ACS agree

---

1. Medtronic, Inc. acquired AVE in January 1999 and thus AVE has been known as Medtronic AVE, Inc. since that time. The district court, by an order dated October 22, 1999, allowed the caption of the consolidated cases to be amended to reflect the name change.

that the arbitration clauses are valid and that their provisions bind them, but AVE asserts that the claims it advances in this patent infringement litigation are outside the scope of the two agreements. The district court agreed with AVE and ACS appeals. We will affirm the district court's order denying the motion to stay the litigation pending arbitration because Bard never owned the claims involved in this litigation and, as a result, disputes regarding them are not subject to the arbitration provisions of either agreement. Thus, although AVE has stepped into Bard's shoes, inasmuch as it owes to ACS only obligations it derived from Bard, the arbitration clauses in the two agreements do not apply to AVE's separate claims involved here.

I. BACKGROUND

ACS's coronary stent delivery systems consist of small pieces of stainless steel that are laser cut from a tube and affixed to a stent delivery catheter. The FDA-approved coronary stent is pre-mounted on a catheter that positions the stent in the appropriate region of the blood vessel. The balloon end of the catheter is inflated to expand the stent and place it against the vessel wall. The catheter then is withdrawn.

(a) The 1992 Agreement

Bard, a company involved in the development, manufacture and sale of medical devices, sued ACS in 1988, alleging infringement of certain of its patents for catheter technology. See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc., No. SA CV 88-646 JSL, 1989 U.S. Dist. LEXIS 18439 (C.D. Cal. July 28, 1989); app. at 352-56. ACS then sued Bard in 1990, alleging infringement of several of ACS's patents for catheter technology, but Bard asserted counterclaims for infringement of Bard's catheter technology patents in that litigation. See Advanced Cardiovascular Sys., Inc. v. C.R. Bard, Inc., No. C90-0503 FMS, 1992 WL 478215 (N.D. Cal. Dec. 22, 1992); app. at 293-351. In January 1992, ACS and Bard settled the actions through an agreement (the "1992 Agreement") in which they cross-licensed various catheter patents to each other and agreed to pay royalties.

3

The 1992 Agreement contained mutual releases which provided that each party:

> on behalf of [itself and its] respective predecessors, successors, parents, subsidiaries, assigns, stockholders, officers, directors, attor neys, agents, employees and representatives hereby releases and discharges the other party, and its r espective predecessors and successors, parents, subsidiaries and their respective assigns, stockholders, officers . . . from any and all debts, claims, demands, damages, liabilities, obligations, causes of action, agr eements, suits, sums of money, and rights, whether known or unknown, suspected or unsuspected, which are based on any actions or inaction occurring prior to the date of this Agreement and which the party now owns or holds, or at any time heretofore owned or held, by reason of any act, matter, cause or thing whatsoever [subject to certain exceptions not relevant here].

1992 Agreement P 8; app. at 87-88.

The agreement also provided for arbitration to settle certain disputes:

> Any dispute between the parties concerning the construction, interpretation, and effect of this Agreement or any clause herein contained, or the rights and liabilities of the parties hereunder , or the coverage of any patent claims licensed herein, shall be resolved, if necessary, by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

1992 Agreement P 15.a; app. at 92.

(b) The 1998 Agreement

In 1997 Bard sued ACS for infringement of certain of its patents for catheters based on actions not cover ed by the 1992 Agreement. See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc., 997 F. Supp. 556 (D. Del. 1998); app. at 357-62. Then in 1998 Bard sued ACS again for infringement of its catheter patents. See C.R. Bard, Inc. v.

4

Advanced Cardiovascular Sys., Inc., No. 98–120 (RRM) (D. Del.); app. at 363–67. To resolve these actions, Bard and ACS entered into a settlement agreement on or about April 4, 1998, in which ACS agreed to pay Bar d $100,000,000, and the parties cross-licensed certain catheter patents to each other. This agreement did not contain any releases but did include mutual covenants not to sue which, with respect to Bard, provided as follows:

> Bard and its Affiliates covenant not to sue ACS and its Affiliates for any and all debts, claims, demands, and liabilities, whether known or unknown, suspected or unsuspected, which are based in any way on any and all of ACS's and its Affiliates past and curr ent domestic and foreign angioplasty catheters including stent delivery catheters. For purposes of this section,`ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters' shall mean ACS's and its Affiliates past and curr ent domestic and foreign angioplasty catheters including stent delivery catheters and shall specifically exclude any future modifications to such products.

1998 Agreement P 4.b; app. at 110.

The 1998 Agreement required ACS to deliver to Bard certain catalogues and materials which showed "current domestic and foreign angioplasty catheters including stent delivery catheters" to identify products exempted from suit by the Agreement. See app. at 110 (1998 Agreement P 4.b). The ACS Coronary Stent Delivery Systems, including the ACS RX Multi–Link and the ACS RX Multi–Link HP , were listed and pictured in the materials that ACS provided to Bard, and these products were the subject of the infringement action. See app. at 56–57. The U.S. and International Product Brochur es ACS delivered listed the integrated stent delivery systems which consist of a stent mounted on a stent delivery catheter. See  app. at 20–38.

In this 1998 Agreement, Bard and ACS also agreed to settle certain disputes by arbitration as pr ovided in the following clause:

> Any dispute between the parties concerning the
> construction, interpretation, and effect of this

5

Agreement or any clause herein contained, or the rights and liabilities of the parties hereunder , or the coverage of any patent claims licensed herein, shall be resolved, if necessary, by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

1998 Agreement P 13; app. at 116.

(c) Actions Between ACS and AVE and A VE's Purchase of Bard's Business

During the period of its disputes with Bard, ACS also was involved in litigation with AVE. ACS first sued AVE in December 1997 in the Northern District of California, and AVE sued ACS on February 18, 1998, in the District of Delaware. AVE's complaint for patent infringement of its stent technology patents against ACS involves two ACS coronary stent delivery systems: the ACS RX Multi–link Stent Delivery System and the ACS RX Multi–link HP Stent Delivery System. AVE also has advanced various state law claims against ACS (including breach of contract, misappropriation of trade secrets, unfair competition, and wrongful acquisition of property and conversion) regarding the development of the stent delivery systems and events that occurred between 1989 and 1991. Then, in April 1998, ACS brought a second patent infringement action in the Northern District of California against AVE.

While these three actions were pending, on October 1, 1998, AVE purchased the assets of Bar d's coronary catheter business which included its various catheter technology patents. See app. at 176. The 1992 Agreement allowed its assignment as long as the patents that were the subject of the Agreement were transferr ed, see app. at 95–96 (1992 Agreement P 22), and the 1998 Agreement allowed its assignment in connection with a merger , consolidation or sale of its stock or sale of the assets of its business. See app. at 119–20 (1998 Agreement P 20). Accordingly, Bard assigned all of its rights and obligations under the two agreements to AVE.

6

On February 8, 1999, in response to AVE's action against it and after the California court transferred the two cases pending before it to Delaware, ACS moved to stay AVE's district court action, Medtronic A VE, Inc. v. Advanced Cardiovascular Sys., Inc., No. 98-80-SLR (D. Del.), pending arbitration of whether either the release in the 1992 Agreement or the covenant not to sue in the 1998 Agreement bars the action. In addition, ACSfiled a demand for arbitration. Obviously, the demand for arbitration was somewhat unusual as ACS predicated it on provisions in agreements to which AVE was not a party when it brought the action. AVE opposed ACS's motion, arguing that Bard never owned AVE's claims against ACS for infringement of AVE's stent patents or the state law claims involved in the litigation between AVE and ACS. AVE also argued that the Bard-ACS agreements did not cover these claims and that they were not subject to arbitration.

In March 1999, the district court held a hearing on ACS's motion and then, on September 30, 1999, denied the motion. See app. at 5 (Mem. Order at 1). The district court held that it could not interpret the release of all claims held by Bard in the 1992 Agreement or its undertakings in the 1998 Agreement as applying to separate claims held by Bard's assignee, AVE. See app. at 16 (Mem. Order at 12). The court stated that "[a]lthough catheters and stents may be bundled for marketing purposes, there can be no question but that catheters and stents involve different technology and patents and that AVE developed its stent technology independent of Bard [the assignor to AVE]." App. at 17 (Mem. Order at 13).

Subsequently, ACS made a motion to reargue its motion to stay the action pending arbitration or, in the alternative, for a stay pending appeal. On March 24, 2000, ACS withdrew its motion to reargue andfiled an appeal from the district court's September 30, 1999 order . On March 31, 2000, ACS moved in this court to stay proceedings in the district court pending appeal, and, after AVEfiled its opposition to ACS's motion, a motions panel of this court referred ACS's motion to the merits panel by an order dated May 5, 2000. ACS, however, has withdrawn the motion as the district court has stayed the proceedings before it.

7

(d) Related Cases and Proceedings

This case, Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc., 98-80-SLR, has been consolidated with the two proceedings ACS br ought against AVE in the Northern District of Califor nia and which the California court transferred to the District of Delaware, Advanced Cardiovascular Systems, Inc. v. Arterial Vascular Engineering, Inc., No. 98-314, and Advanced Cardiovascular Systems, Inc. v. Arterial Vascular Engineering, Inc., No. 98-316. Medtronic, Inc., AVE's parent company, also has sued ACS twice regarding infringement of Medtr onic's stent patents. See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc., No. 97-2459 JMR/FLN (D. Minn.); Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc. and Guidant Corp., No. 99-761 JMR/FLN (D. Minn.). ACS moved to stay the proceedings based on the arbitration clause in the 1998 Agreement between Bard and ACS. The district court denied ACS's motion, and the Court of Appeals for the Eighth Circuit affirmed. See Medtr onic, Inc. v. Advanced Cardiovascular Sys., Inc., 221 F.3d 1343 (table), 2000 WL 637045 (8th Cir. 2000). The court ruled that as the parent corporation of AVE, Medtronic, Inc. was not bound to the 1998 Agreement.

II. DISCUSSION

(a) Jurisdiction

The district court had jurisdiction over this patent infringement case pursuant to 28 U.S.C. S 1331 and 1338(a). We conclude for the reasons we set forth that we have jurisdiction over the appeal of the denial of the motion to stay pending arbitration pursuant to 9 U.S.C. S 16(a)(1)(A) and 28 U.S.C. S 1294(1).

The parties in their primary briefs indicated, without substantial discussion, that this court has jurisdiction over this appeal under 9 U.S.C. S 16(a)(1)(A). W e, however, questioned this point inasmuch as the district court's jurisdiction was based in whole or in part on 28 U.S.C. S 1338 so that under 28 U.S.C. S 1295(a) the United States Court of Appeals for the Federal Circuit would have exclusive jurisdiction over an appeal from a"final decision"

8

in this case. Accordingly, we directed the parties to file supplemental briefs on the jurisdictional point. In their supplemental briefs they have adhered to their position that we have jurisdiction.

After considering these briefs we have deter mined that we have jurisdiction and thus we adjudicate this appeal on the merits. Our starting point is 9 U.S.C. S 16(a)(1)(A) which makes the order in this case appealable. Section 16(a)(1)(A), however, does not indicate the court to which such an appeal may be taken. Thus, we examine the general statutes providing for the courts of appeals' jurisdiction. We conclude that section 1295(a) does not vest jurisdiction in the Court of Appeals for the Federal Circuit because this appeal is not from a "final decision." After all, rather than ending the litigation on the merits, see John Hancock Mutual Life Ins. Co. v. Olick, 151 F.3d 132, 135-56 (3d Cir. 1998), "the order ensure[d] that[the] litigation will continue in the District Court." Gulfstream Aer ospace Corp. v. Mayacamas Corp., 485 U.S. 271, 275, 108 S.Ct. 1133, 1136 (1988); see Aluminum Co. of Am. v. Beazer East, Inc., 124 F.3d 551, 557 (3d Cir. 1997). Furthermore, we see no reason to regard the order asfinal under the collateral order doctrine as we are satisfied that even if it were not appealable under section 16(a)(1)(A), it effectively could be reviewed after entry of a final judgment in the district court. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458 (1978); Queipo v. Prudential Bache Secs., Inc., 867 F.2d 721, 722 (1st Cir. 1989). Thus, section 1295(a) does not vest jurisdiction in the Court of Appeals for the Federal Circuit over the current appeal in this case.

We also conclude that the Court of Appeals for the Federal Circuit could not have jurisdiction over this appeal under 28 U.S.C. S 1292(c) which vests it with exclusive jurisdiction over an appeal from an interlocutory order as described in 28 U.S.C. S 1292(a)(1) or (b) in cases in which it would have jurisdiction over an appeal fr om a final decision under section 1295. Plainly section 1292(b) cannot be applicable as the procedures for allowing an interlocutory appeal as set forth in that section have not been followed here.

Thus, we are left to consider only section 1292(a)(1) which deals, inter alia, and as possibly applicable here, with orders refusing to grant injunctions. Upon consideration of that subsection we are satisfied, in harmony with Gulfstream, 485 U.S. at 287-88, 108 S.Ct. at 1142-43, and in accordance with the weight of authority, that the order denying the stay should not be r egarded as appealable as an order denying an interlocutory injunction under section 1292(a)(1). See McLaughlin Gor mley King Co. v. Terminix Int'l Co., 105 F .3d 1192, 1193-94 (8th Cir. 1997); Queipo, 867 F.3d at 722; see also Cofab, Inc. v. Philadelphia Joint Bd. etc., 141 F.3d 105, 108-09 (3d Cir. 1998).

In view of the foregoing analysis we come to the conclusion that the Court of Appeals for the Federal Circuit would not have had jurisdiction if ACS had pr osecuted this appeal to that court. That conclusion, however , in itself does not mean that we do have jurisdiction. After all, what we have held with respect to the Court of Appeals for the Federal Circuit's lack of jurisdiction under section 1295(a) would apply equally to us if we attempted to exer cise jurisdiction under our usual source of jurisdiction, 28 U.S.C. S 1291, as that section, like section 1295(a), provides for jurisdiction only over appeals fr om "final decisions." Moreover, we no mor e can exercise jurisdiction under section 1292(a)(1) by regarding the order denying the stay as an order denying an interlocutory injunction than could the Court of Appeals for the Federal Cir cuit under section 1292(c)(1) which incorporates that section. Thus, this case is the unusual one that finally tur ns on the residual jurisdictional statute, 28 U.S.C.S 1294(1), which provides, with exceptions that we hold ar e inapplicable, that an appeal from a reviewable decision of a district court "shall be taken to the . . . court of appeals for the circuit embracing the district." Inasmuch as the appeal has been taken from the United States District Court for the District of Delaware, which is within this circuit, we have jurisdiction.

In reaching our result we have not overlooked the opinion of the Court of Appeals for the Seventh Circuit in In re BBC International, Ltd., 99 F.3d 811 (7th Cir. 1996), a case that

we brought to the parties' attention when we r equested the supplemental briefs. In BBC, the regional court of appeals held that it did not have jurisdiction to entertain a petition for a writ of mandamus pursuant to 28 U.S.C. S 1651(a) which authorizes courts of appeals "in aid of their respective jurisdictions" to issue writs. Id. at 812–13. In reaching its conclusion, the court indicated that the "[p]ower to issue writs of mandamus depends on [the] power to entertain appeals when the case ends," and it thus held that it did not have jurisdiction to issue the writ because any appeal from a final decision in the case would have to be taken to the Court of Appeals for the Federal Circuit. Id. at 813. Thus, for the court to determine whether it had jurisdiction to entertain a writ of mandamus it had to work backwards from its conclusion on the question of whether it would have jurisdiction at the time of a final decision.

Here, however, our methodology is dif ferent as we are deciding the case on the basis of what court has jurisdiction now. Thus, our analysis in no way is confined by a provision such as that in section 1651(a) that a court may issue writs "in aid" of its jurisdiction. Consequently, the circumstance that the Court of Appeals for the Federal Circuit will have exclusive jurisdiction over any appeal from a final decision in this case does not requir e that we conclude differently than we do with r espect to our jurisdiction over the appeal in this case at this time.

(b) Standard of Review

We exercise plenary review over the legal questions concerning the applicability and scope of an arbitration agreement. See Harris v. Green T ree Fin. Corp., 183 F.3d 173, 176 (3d Cir. 1999) (considering a district court's denial of a motion to compel arbitration and stay pr oceedings pending arbitration); Pritzker v. Merrill L ynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1113 (3d Cir . 1993). Nevertheless, to the extent that the district court predicated its decision on findings of fact, our standar d of review is whether those findings were clearly err oneous.2 See Kaplan

_____

2. When a district court interprets language contained in contracts we review its determination under the clearly erroneous standard. See John

11

v. First Options of Chicago, Inc., 19 F.3d 1503, 1509 (3d Cir. 1994).

(c) Court Decides Arbitrability of Dispute

When Congress enacted the Federal Arbitration Act, 9 U.S.C. SS 1-13, it provided a framework for the development of a body of uniform federal law gover ning contracts within its scope. Therefore, if the Arbitration Act is applicable, federal law applies in questions regarding the construction and enforcement of an arbitration clause, even in those cases in which the district court's jurisdiction is based on diversity of citizenship.3 See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626, 105 S.Ct. 3346, 3353 (1985); Goodwin v. Elkins & Co., 730 F .2d 99, 108 (3d Cir. 1984); Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk, 585 F.2d 39, 43 (3d Cir . 1978). Accordingly, if the Arbitration Act applies, federal law, including general principles of contract law, determines whether there is a valid arbitration clause. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924 (1995);

_____

F. Harkins Co. v. Waldinger Corp., 796 F.2d 657, 658 (3d Cir. 1986). But if the district court engages in contract construction, we exercise plenary
review. See id. at 659. "By `interpretation of language' we determine what ideas that language induces in other persons. By`construction of the contract,' as that term will be used her e, we determine its legal operation
--its effect upon the action of courts and administrative officials. If we make this distinction, then the construction of a contract starts with the interpretation of its language but does not end with it; while the process of interpretation stops wholly short of a deter mination of the legal relations of the parties." Id. at 659 (citing 3 Corbin, Corbin on Contracts,
S 534 at 9 (1960)).

3. Although the Arbitration Act creates federal substantive law regarding agreements to arbitrate, it does not cr eate any independent federal-question jurisdiction under 28 U.S.C. S 1331. 9 U.S.C. S 4 "provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue. . . . Section 3 likewise
limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 26 n.32, 103 S.Ct. 927, 942 n.26 (1983).

Mitsubishi, 473 U.S. at 626, 105 S.Ct. at 3353; Harris, 183 F.3d at 178; Goodwin, 730 F.2d at 108.

In appropriate circumstances, 9 U.S.C.S 4 allows litigants to obtain an order requiring a r eluctant party to arbitrate a dispute, as it directs the district court to order a party to arbitrate if it is "satisfied that the making of the agreement for arbitration or the failur e to comply therewith is not an issue." PaineWebber Inc. v. Hartmann, 921 F.2d 507, 510 (3d Cir. 1990); see Harris, 183 F.3d at 178-79. But under section 4 when one party refuses to arbitrate, the issue of whether the dispute is within the scope of the agreement requires district court r esolution. See AT & T Techs., Inc. v. Communication Workers of Am., 475 U.S. 643, 649, 106 S.Ct. 1415, 1418 (1986); PaineW ebber, 921 F.2d at 510-11. There is an issue in dispute in those circumstances because arbitration is "fundamentally a creature of contract," Kaplan, 19 F.3d at 1512, and thus arbitrators have the authority to resolve disputes only if the parties have agreed to submit to arbitration. See AT&T Techs., 475 U.S. at 648, 105 S.Ct. at 1418 (" `[A]rbitration is a matter of contract and a party cannot be r equired to submit to arbitration any dispute which he has not agreed so to submit.' "). Accordingly, for a court to enter an order compelling arbitration there must be sufficient evidence that the parties consented to arbitration in an expr ess agreement. See United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1353 (1960); Kaplan, 19 F.3d at 1512; PaineWebber, 921 F.2d at 511; Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980).

While a court asked to stay proceedings pending arbitration must determine whether ther e is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the substantive scope of that agreement, "its function [nevertheless] is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." United Steelworkers of Am. v. American Mfg. Co., 363 U.S. 564, 567-68, 80 S.Ct. 1343, 1346 (1960); see also

13

United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36–37, 108 S.Ct. 364, 370 (1987). To deter mine whether a claim falls within the scope of an arbitration agr eement, the "focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." Svedala Indus., Inc., Civ. No. 96–4538, 1996 WL 590861, at *3 (E.D. Pa. 1996), citing, inter alia, Mitsubishi, 473 U.S. at 622, n.9, 105 S.Ct. at 3351 n.9. If the court deter mines that there is an agreement to arbitrate and that the issue in dispute falls within the scope of the agreement, it must submit the matter to arbitration without ruling on the merits of the case. See Beck v. Reliance Steel Prods. Co., 860 F.2d 576, 579 (3d Cir. 1988).

However, federal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration. See Moses H. Cone, 460 U.S. at 24–25, 103 S.Ct. at 941; First Liberty Inv. Group v. Nicholsberg, 145 F.3d 647, 653 (3d Cir. 1998); Kaplan, 19 F.3d at 1512. There is a "presumption of arbitrability." PaineWebber, 921 F.2d at 511; see Pritzker, 7 F.3d at 1114–15; Stateside Mach. Co. v. Alperin, 591 F .2d 234, 240 (3d Cir. 1979) ("doubtful issues regar ding the applicability of an arbitration clause are to be decided in favor of arbitration."). An order to arbitrate "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpr etation that covers the asserted dispute." United Steelworkers v. Warrior, 363 U.S. at 582–83, 80 S.Ct. at 1353; see also AT & T Techs., 475 U.S. at 650, 160 S.Ct. at 1419; First Liberty Inv. Group, 145 F.3d at 653; Schulte v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co.), 133 F.3d 225, 231 (3rd Cir. 1998); Sharon Steel Corp. v. Jewell Coal and Coke Co., 735 F.2d 775, 778 (3d Cir. 1984) ("So long as the appellant's claim of arbitrability was plausible, interpretation of the contract should have been passed on to the arbitrator."). Yet ther e is a limit as to how far a court should go in resolving a dispute in favor of arbitration because, as we stated in PaineWebber, while interpretive disputes should be resolved in favor of arbitrability, "a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." PaineWebber, 921 F.2d at 513.

14

(d) The 1992 Settlement Agreement and Release

As we have indicated, AVE does not dispute that it is bound by the agreements between ACS and Bar d, including the arbitration clauses. Accordingly, the question for us to determine is whether the district court err ed in holding that the dispute is not within the scope of the arbitration clauses. In the release4 contained in the 1992 Agreement, each party released the other party from demands, damages, liabilities, obligations, causes of action, agreements, suits, sums of money and rights, which were based on any actions or inaction occurring prior to the date of the agreement and which the party then owned or held. See app. at 87-88 (1992 Agreement P 8). The agreement also provided for arbitration of "any dispute between the parties concerning the construction, interpr etation and effect of this Agreement or any clause herein contained, or the rights and liabilities of the parties her eunder." App. at 92 (1992 Agreement P 15.a).

But even if AVE predicates its claims on property interests extant prior to the date of the 1992 Agreement, inasmuch as Bard did not then own or hold the interests of AVE, Bard could not have agreed to release ACS from or arbitrate claims relating to those inter ests. Accordingly, while it is true that when AVE accepted the assignment of the 1992 agreement from Bard it "step[ped] into [Bard's] shoes," see Premier Dental Prod. Co. v. Darby Dental Supply Co., 794 F.2d 850, 853 (3d Cir. 1986); Professional Collection Consultants v. Hanada, 62 Cal. Rptr . 2d 182, 184, 53 Cal. App. 4th 1016, 1018-19 (Cal. Ct. App. 1997), the agreement to arbitrate cannot be applied to AVE's separate interests that Bard never owned. Therefore, although this litigation is extraordinarily complex, our resolution of it requires nothing mor e than the application of a rather straightforward principle.

_____

4. A release is a provision that intends a present abandonment of a known right or claim. By contrast, a covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue. . . ." McMahan & Co. v. Bass, 673 N.Y.S.2d 19, 21, 250 A.D.2d 460, 461 (1998).

ACS argues that Svedala Industries, 1996 WL 590861, supports the view that releases given by an assignor can bar independent, pre-existing claims of an assignee where the release explicitly applies to successors and assigns. It argues that, like AVE, the plaintif f in Svedala contended that the release could not bar its independent patent claims because the promisor did not hold rights to the patent at issue at the time of the release. In Svedala, two companies, Barmac and Tidco International, entered into a license agreement in 1988 regarding the `571 patent and related products that Barmac owned. The patent r elated to an impact breaking apparatus designed to r educe the size of certain minerals. Tidco and Svedala Industries, Inc. ("Svedala Inc.") were sister companies, as both were subsidiaries of Svedala Industries, AB ("Svedala AB"). See Svedala, 1996 WL 590861, at *1. In 1993, T idco, Svedala Inc., and Svedala AB entered into a settlement agreement and mutual release with Kemper Equipment Inc. over certain disputes regarding the sales and operations of their respective crushing and screening equipment business and ancillary operations. See id. at *1.

The release agreement provided that the parties on behalf of themselves and their respective:

> predecessors, successors, heirs, assigns, . . . subsidiaries, sister companies, parent companies and all persons, connected with them fully release and discharge the other and their respective predecessors, successors . . . subsidiaries, sister companies, par ent companies . . . from any and all claims, demands, causes of action, obligations, damages and liabilities of any nature whatsoever, whether or not now known, suspected or claimed . . . .

Id. at *1. About one year later in 1994 T idco acquired Barmac. See id. at *2. Then in 1996, T idco assigned the '571 patent Barmac previously owned to Svedala Inc. See id. at *2. Svedala Inc. then brought a lawsuit against Kemper and Rock Engineered for infringement of the '571 patent. Kemper and Rock Engineered moved to stay the proceedings and to compel arbitration. See id. at *2.

The court rejected Svedala's argument that Svedala

16

predicated on a contention that at the time of the 1993 release agreement it had no rights in the '571 patent and therefore had no patent infringement claim to release so that the matter did not fall within the arbitration clause. In rejecting the argument, the court r easoned, inter alia, that although Svedala Inc. did not have rights in the patent at the time of the release, Barmac did have rights in the patent at that time, and Tidco is the successor of Barmac5 and is a sister company to the plaintiff Svedala Inc. See id. at *4. The release specified that it applied to all successors and sister companies and all persons connected with them, and Svedala Inc., in addition to being a party to the release, was a sister company of Tidco (a party to the release) and also later an assign. See id. at *1.

Obviously the situation in Svedala is completely distinguishable from that here. First of all, the plaintiff Svedala Inc. itself was a party to the broad 1993 release, whereas AVE was not a party to the 1992 release between Bard and ACS. Second, even if Svedala had not been a party to the release, Tidco was a party to the release and entered into it on behalf of its sister companies, of which Svedala was one. In this case, AVE was not bound to the release agreement between Bard and ACS through a relationship with either of the parties existing at the time of the execution of the release. Because the defendants in Svedala put forth evidence that they had made and offered for sale the accused infringing device prior to the time of the release, the fact that Svedala Inc. was a party to the release is relevant, even if the claim was unknown.

In contrast, in this case, although Bard was a party to the release and later assigned the contract to AVE, at the time of the release Bard did not own and, in fact, never owned the patents that are now the subject of the suit between AVE and ACS. This is a crucial dif ference because here, unlike in Svedala, the party seeking to invoke the arbitration clause is trying to apply the clause in an action on a patent that was not acquired from a party to the

_____

5. We also note that the district court in Svedala apparently regarded Barmac as a predecessor of Tidco for purposes of the release. See Svedala, 1996 WL 590861, at * 4.

agreement to arbitrate. Thus, if AVE's action against ACS concerned patents that Bard acquir ed after the date of the release and Bard assigned the contract containing that release to AVE, this case would be in a very different posture.

In another case that ACS cites to support its case, Universal Studios Inc. v. Viacom Inc., 705 A.2d 579 (Del. Ch. 1997), two parties entered into a joint ventur e agreement relating to the cable television business that included a non-compete provision requiring that the participants not engage in the same business as the joint ventur e. See id. at 583. Another party, Viacom, then bought the interests of one of the participants in the joint venture. This acquisition posed a problem because Viacom alr eady was in the cable business. After complex negotiations and business developments that we need not describe, litigation ensued. The court held that the non-compete clause was ef fective with respect to Viacom. See id. at 590–91, 600.

Universal Studios is different fr om this case in that the parties there were involved in a joint venture and had signed a non-compete agreement and exclusivity agreement, and the purchaser of the inter est of one joint venturer stepped into its shoes thereby becoming as subject to the non-compete provision of the joint venture agreement as to all its other provisions. Accordingly, the joint venture agreement and the non-compete and exclusivity agreements gave rise to different fiduciary and contractual obligations and duties than those provided by a release or covenant not to sue which relate to obligations and claims of the parties subject to the agreement rather than claims of a third party. Thus, Universal Studios dealt with the obligations of a party to adhere to the terms of a joint venture when it acquired an interest in the ventur e. Accordingly, the factual pattern in Universal Studios is so distinct from that here that the case is not useful in resolving the controversy here.

Reid v. Contel Cellular of Louisville, Inc., 208 F.3d 214 (table), 2000 WL 303005 (6th Cir. 2000), is a more pertinent citation than Svedala and Universal Studios. In Reid, Contel acquired a portion of the business of McCaw Cellular, Reid's employer. Contel, however, though it hired other McCaw Cellular employees, did not hire Reid,

18

according to Reid because of her physical handicap. Reid then filed an action under Kentucky law against Contel in state court which was removed to the district court. Reid, however, remained McCaw Cellular's employee.

Subsequently Reid left McCaw Cellular's employment and at that time received a severance package pursuant to which she released McCaw Cellular and its successors and assigns from all possible claims. Contel then successfully moved for summary judgment on the ground that it was a "successor/assign" of McCaw Cellular. On appeal, the court of appeals reversed, indicating that "Contel's assignee status vis-a-vis McCaw extends only to the subject matter contained within the purchase agreement and that it is illogical to allow Contel to benefit as assignee from every release to which McCaw has been a party since the date of the purchase agreement." Id. at * 2.

We certainly agree with Reid because a contrary holding would have meant that the successor to a release could apply it to bar claims quite beyond anything the parties to the release could have contemplated. After all, a releasor giving a release to a second party hardly would anticipate that, as a result of an assignment, a thir d party could apply the release to a claim the releasor had against the third party that was quite independent of its claims against the second party. Reid, then, supports the r esult the district court reached in this case.

Moreover, a release usually will not be construed to bar a claim which had not accrued at the date of its execution or a claim which was not known to the party giving the release. See Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 895-96 (3d Cir. 1975). While it is true that cases ACS has cited support the view that a release can bar even unknown claims, these cases would be relevant only if it were Bard's unknown claims that AVE, stepping into Bard's shoes, wished to pursue against ACS. See id. at 894-96 (holding that although ordinarily words of release will not be construed to bar unknown claim, parties intended to release accrued but unknown antitrust claims); San Diego Hospice v. San Diego, 37 Cal. Rptr. 2d 501, 504-05, 31 Cal. App. 4th 1048, 1052-54 (Cal. Ct. App. 1995). Inasmuch as AVE seeks to assert claims that Bard never owned, the

19

cases ACS cites are not relevant. Accor dingly, it can be said with "positive assurance" that the claims in this case which AVE asserts against ACS are not within the scope of the release in the 1992 Agreement and that A VE thus is not bound to arbitrate disputes regarding them.

(e) The 1998 Settlement and Covenant Not to Sue

The covenant not to sue in the 1998 Agreement provided:

> Bard and its Affiliates covenant not to sue ACS and its Affiliates for any and all debts, claims, demands, and liabilities, whether known or unknown, suspected or unsuspected, which are based in any way on any and all of ACS's and its Affiliates past and curr ent domestic and foreign angioplasty catheters including stent delivery catheters. For purposes of this section,`ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters' shall mean ACS's and its Affiliates past and curr ent domestic and foreign angioplasty catheters including stent delivery catheters and shall specifically exclude any future modifications to such products.

1998 Agreement P 4.b; app. at 110. However, the covenant not to sue does not apply to AVE's separate claims that Bard never owned.

In Spindelfabrik Suessen–Schurr Stahlecker & Grill v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft , 829 F.2d 1075, 1079 (Fed. Cir. 1987), defendant Schubert had entered into a license agreement with Murata Machinery, Ltd. ("Murata") in 1982. Under this agr eement, Murata granted a nonexclusive license to its patents to Schubert. See id. In 1983, Suessen sued Schubert for infringement of Suessen's '946 patent, which dominated the Murata patents under which Schubert had a license. See id. at 1076. Suessen later bought Murata's technology and business from Murata in 1984. See id. at 1079. Schubert, in defense against Suessen's action, argued that it had an implied license under the Suessen '946 patent, as Schubert's actions were merely an exer cise of its license under the 1982 agreement. See id. Schubert also claimed that when Suessen acquired the Murata patents, it "stepped in the shoes" of Murata and ther efore was barred

20

by legal estoppel from suing Schubert for practicing the licensed technology. See id.

The court rejected Schubert's argument for an implied license. Id. at 1080. Under the agreements at issue, Suessen had not made a promise not to sue under Suessen's separate patents, and treating it as such would be an overly broad interpretation. See id. at 1081. "[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee. . . . Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents." Id.

Similarly, in ZapatA Industries Inc. v. W .R. Grace & Co., 51 U.S.P.Q.2d 1619, 1620 (S.D. Fla. 1999), ZapatA Industries Inc. ("ZapatA") and Advanced Oxygen Technologies, Inc. ("AOTI") settled disputes between them by entering into a license agreement in 1991 under which AOTI was to receive ownership of the oxygen technology and all rights in related patents issued or applied for by either party and ZapatA was given licenses of all patents covering the oxygen technology and agreed to pay royalties to AOTI. See id. at 1622. In 1992, following a breach of contract dispute, ZapatA and AOTI entered a settlement agreement under which ZapatA agreed to assign all patents and patent applications to AOTI and the license agr eement was amended and would remain in effect unless the parties agreed on a new one. The settlement agr eement did not expand or amend the provisions of the license agreement in which each party had made the representation that as of August 1, 1991 (the date of the license agreement), the technology licensed to the other party did not infringe any third party patent rights. See id. at 1622-23. In 1991 and 1992, after the date of the license agreement between AOTI and ZapatA, W.R. Grace & Co. ("Grace") independently obtained two patents (which AOTI never owned). See id. at 1623. In 1995, Grace acquired AOTI's oxygen scavenging technology and its patents, under which ZapatA was licensed by AOTI. The purchase agreement did not contain a provision that would release ZapatA or any other third party from liability for infringing the Grace patents. See id. at 1623.

21

ZapatA claimed but Grace denied that ZapatA had an "implied license" under the Grace patents because Grace assumed AOTI's warranty of non-infringement under the AOTI-ZapatA settlement agreement. See id. at 1625. Consequently, ZapatA instituted an action seeking a declaration that Grace was precluded fr om enforcing its patents against ZapatA by reason of implied license and estoppel. Grace filed a motion for summary judgment on this issue because AOTI never owned the Grace patents or had any rights under those patents and therefor e did not have any right under them to provide to ZapatA through the AOTI-ZapatA agreements. See id. The court stated: "ZapatA received nothing more fr om AOTI than a promise not to be sued by AOTI on AOTI's patents. That pr omise did not, and . . . could not, apply to Grace's patents which AOTI never owned and never had any rights under . To the extent Grace assumed the license, it owed ZapatA nothing more than what AOTI had owed. . . . Grace's `commitment' does not include a promise, express or implied, not to sue under Grace's own patents." Id. at 1626-27.

While obviously Schubert and ZapatA involve facts distinct from those here, similar principles apply in this case. At the time of the 1998 Agreement, Bar d and ACS contracted for a covenant not to sue. When A VE stepped into Bard's shoes, it had to adhere to the covenant not to sue on Bard's claims. But absent a pr ovision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held and not in an expansion of those rights to include those held by the assignee. "An assignment does not modify the terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged. . . . Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor." Citibank, N.A. v. T ele/Resources, Inc., 724 F.2d 266, 269 (2d Cir. 1983). "[A]n assignment is intended to change only who performs an obligation, not the obligation to be performed." Capitan Enter ., Inc. v. Jackson, 903 S.W.2d 772, 776 (Tex. Ct. App. 1994)." `An assignee

22

obtains only the right, title and interest of his assignor at the time of his assignment, and no more.' " Id., citing State Fidelity Mortgage Co. v. Varner, 740 S.W.2d 477, 480 (Tex. App.--Houston [1st Dist.] 1987). Thus, A VE did not by accepting the assignments from Bard limit its rights under the patents involved in this action which it did not obtain from Bard.

ACS argues that if Bard had acquir ed a new patent the day after the 1998 Agreement was executed, the agreement by its terms would have prevented Bar d from asserting that new patent against the ACS products because the covenant not to sue is product based, not patent based. ACS maintains that the district court focused on the technology and the patents rather than the products.6 See Br. of Appellant 23. But the "stepping into the shoes" assignment means that even if Bard had obtained a new patent related to catheters the day after the Agreement was executed, AVE could not now sue ACS based on that patent if the covenant not to sue was interpreted to cover a patent that was obtained after the covenant not to sue was signed.7 However, if AVE had acquired a new patent the day after the parties executed the 1998 Agreement, it still could sue on it because Bard never would have owned that patent and therefore the patent would not have been within the scope of the agreement.

_____

6. The district court reasoned that ther e "can be no question but that catheters and stents involve different technology and patents and that AVE developed its stent technology independent of Bard. The plain and unambiguous language of the 1998 Agreement, therefore, demonstrates that the litigation at issue, involving stent technology, is not an arbitrable grievance under the 1998 Agreement." App. at 17 (Mem. Order at 13).
7. It is uncertain whether the covenant not to sue would be interpreted to cover a patent that was obtained after the covenant not to sue was signed inasmuch as the covenant covers claims that are based on ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters, specifically excluding any future modifications to such products. Therefore, it is possible that a patent obtained after this agreement still would be based on a "past or current" catheter; however, it is also possible that a patent obtained after the agreement would not be considered based on such a catheter and could, for example, be considered a "futur e modification."

III. CONCLUSION

For the foregoing reasons, we will affir m the district
court's order denying ACS's motion to stay the proceedings
in the district court pending arbitration.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

24