

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-17-2003

# MLC Grp Inc v. Tenet Healthcare

Precedential or Non-Precedential: Non-Precedential

Docket No. 01-4185

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"MLC Grp Inc v. Tenet Healthcare" (2003). *2003 Decisions.* Paper 453.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/453

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 01-4185
_____


MLC GROUP, INC. n/k/a EPLUS GROUP, INC.,

v.

TENET HEALTHCARE CORPORATION;
TENET HEALTH SYSTEM PHILADELPHIA,
INC.; OFFICE OF THE U.S. TRUSTEE,

MLC Group, Inc.,
Appellant


_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civ. No. 01-cv-00881)
Honorable Donald E. Ziegler, District Judge

_____

Argued:  February 27, 2003

BEFORE:  SCIRICA, Chief Judge[*],
GREENBERG and JOHN R. GIBSON[**],  Circuit Judges.

(Filed: June 17, 2003 )

_____

*Judge Scirica began his term as Chief Judge on May 4, 2003.

**The Honorable John R. Gibson, United States Court of Appeals for the Eighth
Circuit, sitting by designation.

Michael E. Geltner, Esquire (Argued)
Geltner & Associates
Number Ten E Street, S.E.
Washington, DC  20003

Counsel for Appellant

Beverly W. Manne, Esquire (Argued)
Tucker Arensberg
1500 One PPG Place
Pittsburgh, PA  15222

Counsel for Appellees,
Tenet Healthcare Corporation;
Tenet Health System Philadelphia, Inc.

_____

OPINION OF THE COURT
_____

JOHN R. GIBSON, <u>Circuit</u> <u>Judge</u>:

In this appeal from a district court decision affirming an order of a bankruptcy court, MLC Group, Inc. seeks to recover from Tenet Healthcare rent on a lease of equipment for a time period after MLC had sold the equipment to Tenet.  The bankruptcy court[1] found that MLC sold Tenet the lease schedules representing the equipment, and therefore no rent accrued under the lease schedules.  The district court affirmed.  On appeal, MLC contends that there was no sale of the schedules and argues that rent continued to accrue.  We will affirm the judgment of the district court.

---

[1]The Honorable M. Bruce McCullough, United States Bankruptcy Judge for the Western District of Pennsylvania.

2

I.

The debtors in the underlying bankruptcy proceeding are Allegheny Health Education and Research Foundation and related entities,[2] which we refer to collectively as Allegheny. Allegheny leased computers from MLC under a master lease. The actual equipment to be leased, as well as the rent owed for each item of equipment and the rental term for each such item, were not described in the master lease, but in various schedules attached to it.

Allegheny filed for Chapter 11 bankruptcy on July 21, 1998. Tenet purchased Allegheny's assets on November 10, 1998, after which Tenet entered into possession of the leased equipment. Under the asset purchase agreement, Tenet assumed liability for the equipment lease as of the purchase date, but it did not assume pre-existing obligations.

On November 19, 1998, following negotiations and correspondence that will be described more fully hereafter, Tenet paid MLC $1.1 million. There was no written contract commemorating the parties' agreement. Later, on January 13, 1999, Tenet paid MLC another $250,000 in connection with equipment in its possession that had been overlooked in the earlier negotiations. Again, Tenet made the payment without benefit of a written contract. What Tenet got for its $1.35 million is the subject of dispute.

Not until April 29, 1999, did Allegheny move to reject the MLC equipment lease

---

[2]Allegheny University of the Health Sciences, Allegheny University Medical Practices, Allegheny Hospitals, Centennial, and Allegheny University Hospitals-East.

as an executory contract. The bankruptcy court ordered that the leases be rejected as of May 9, 1999, 180 days after Allegheny sold its assets to Tenet.

In August 1999, MLC filed an amended proof of claim in the bankruptcy proceeding asking for rent under the leases. MLC asked for $537,043.68 in rent, covering both the period from the bankruptcy petition (July 21, 1998) through the date of Tenet's purchase of Allegheny's assets (November 10, 1998) and the period from the asset sale up until May 9, 1999, the official lease rejection date. MLC then filed a motion for payment of rent from the estate, citing 11 U.S.C. § 365(d)(10). Because Tenet had assumed Allegheny's obligations that accrued after the asset purchase, Tenet was the real party in interest defending against the motion to the extent it sought rent for the period after the asset purchase. The bankruptcy court held an evidentiary hearing.

At the hearing, MLC's Chief Operating Officer, Thomas Howard, testified that MLC did not sell the equipment to Tenet. "It was our understanding that we could not sell the equipment, that it was part of the bankruptcy proceedings, and that it would violate the process of bankruptcy," he said. He testified that MLC understood that the November 19, 1998 payment from Tenet to MLC of $1.1 million was payment for "a continuation of status quo" or "forbearance," and that at some point in the future, depending on what happened in Allegheny's bankruptcy proceedings, there would be a sale and transfer of title to Tenet. When MLC later discovered that some of the equipment had not been included in the earlier transaction, it negotiated with Tenet for an

4

additional payment of $250,000 with regard to the equipment listed on Schedule 106. MLC sent Tenet an "invoice" for $250,000. As with the $1.1 million transaction, Howard said he "understood the agreement to be similar to the one that we had arranged before for the previous schedules where we were allowing the equipment to stay in place, and we were putting forth a charge to allow that to happen." Howard admitted that Tenet had asked MLC to provide a bill of sale showing that the payments Tenet made included sales tax. Howard said that he had responded: "[W]e had labeled this as a termination charge so that it was not a taxable event in the State of Pennsylvania at the time it was issued."

At the hearing, Tenet called its Senior Vice President Alan Cranford, who testified that he personally negotiated the purchase of the equipment with Phil Norton, who was President and Chief Executive Officer of MLC. Cranford testified that after reaching an oral agreement in mid-October 1998 (before the November 10 purchase of Allegheny's assets), Norton and Cranford both drafted letters to memorialize the agreement and sent them to each other for the other to sign. Neither signed the other's letter.[3] Tenet's letter stated that Tenet rejected all equipment lease agreements between MLC and Allegheny and that Tenet agreed to purchase the assets listed on Schedules 100, 102 and 201 for $1.1 million. Norton's letter on behalf of MLC said that Allegheny would "assume MLC's lease in whole and assign it to Tenet"; that Tenet would "purchase all of the leased

---

[3]There was no signed copy of the Tenet letter (which Cranford drafted for the signature of another Tenet officer) in evidence, but Cranford testified that the letter was sent to MLC about the last week in October. Howard testified at trial that he was confident that Norton did not receive Cranford's letter.

equipment for $1,100,000, effective upon the closing of Tenet's purchase of the hospitals"; that upon the purchase "MLC will have no further claims on either Tenet or the equipment"; and that MLC would retain the right to receive "cure" payments from Allegheny.[4] Cranford said that when he received Norton's letter, he told Norton that Tenet could not agree to assume the lease, but would prefer to do a straight purchase. Cranford said that he did not recall Norton being concerned about this discussion, but that Norton seemed interested in "moving forward with the transaction."

Cranford testified that shortly after Tenet's purchase of Allegheny's assets in November, Cranford sent MLC a check for $1.1 million. Cranford understood that the money was to pay for the "purchase of the assets under lease." After Tenet had paid MLC the $1.1 million, Cranford and Norton discussed whether the $1.1 million included sales tax; Tenet's position was that MLC would be responsible for sales tax on the transaction, but MLC wanted to find a way to avoid having to pay sales tax. Cranford said that Norton resolved this by characterizing the transaction as a "lease termination which he felt [was] not subject to a sales tax." Cranford testified: "He assured me that the lease termination would terminate the lease and that MLC would not seek to reacquire the assets and would allow them to remain with Tenet."

With regard to the $250,000 payment, as early as November 6, 1998, MLC's Norton sent Cranford a letter that began, "Thank you for your consideration in purchasing

---

[4]MLC's counsel agreed in argument before the bankruptcy court that these "cure" payments were "for matters prior to the sale."

6

Schedule 106 as we discussed." MLC then sent an invoice for Schedule 106 "Termination Charge."

On February 5, 2001, the bankruptcy court issued its first order. The court found that MLC had sold Tenet Schedules 100, 102 and 201 on November 19, 1998. Therefore, Tenet owed nothing on those lease schedules but the rent from November 10 (the day Tenet bought Allegheny's assets) to November 19. The bankruptcy court also found that Tenet bought Schedule 106 at some point prior to December 9, 1998. The court scheduled a hearing for February 21 to resolve issues concerning lease Schedule 103.

The court rejected MLC's claims based on its findings that (1) before payment of the $1.1 million, the parties had corresponded concerning "purchase" of the equipment; (2) before payment of the $250,000, Thomas Howard filed a pleading with the court stating that Tenet had orally agreed to buy the Schedule 106 equipment; (3) it would have made no economic sense for Tenet to have paid $1.35 million for "forbearance" without acquiring ownership of the equipment, since back rent did not even remotely approach that amount; (4) Tenet sent MLC a letter on February 19, 1999, asking MLC to confirm that Tenet paid $1.1 million and $250,000 for "termination" of the leases, acquisition of the equipment and associated taxes, which the bankruptcy court considered evidence that Tenet understood it had purchased the schedules; and (5) the testimony of MLC's witness Thomas Howard was inconsistent with the documents produced at trial and MLC failed to

produce Phil Norton, who was actually engaged in the oral negotiation of the transactions. The court found "the entire idea of 'forbearance' with respect to the $1.35 million paid by Tenet to have been concocted by MLC at some point well subsequent to November 19, 1998 or January 13, 1999, as a means by which the imposition of sales tax could be avoided with respect to Tenet's acquisition of Schedules 100, 102, 201 and 106."

On March 21, 2001, the bankruptcy court issued a final order confirming its earlier findings and entering judgment against Tenet for nine days' rent on Schedules 100, 102 and 201, in the amount of $12,850.69; for two days' rent under Schedule 106, in the amount of $1,056.23[5]; and for 180 days' rent with respect to Schedule 103, which Tenet never purchased, in the amount of $901.92.

MLC appealed to the district court, which affirmed the bankruptcy court's orders.

## II.

On appeal, MLC does not dispute that it sold the leased equipment to Tenet. Instead, it now argues that the bankruptcy court did not "find" that Tenet bought the schedules as well as the equipment, because the court did not point to any evidence that would have supported such a finding.

We review the district court's order de novo. Interface Group-Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 130-31 (3d

---

[5]The court found that the parties entered a contract for the Schedule 106 transaction as early as November 13, 1998, but the contract permitted payment to be made later.

Cir. 1998).  Both we and the district court review the bankruptcy court's legal determinations de novo and its findings of fact under the clear error standard.  Id.

MLC contends that the bankruptcy court's conclusion that MLC sold Tenet the schedules was a legal conclusion, subject to de novo review, not a finding of fact, subject only to review for clear error.  MLC argues that the only fact the court found was that the parties agreed to the sale of the equipment and that the court made a legal determination that sale of the equipment extinguished the schedules.  Contrary to MLC's contentions, the bankruptcy court's order leaves no doubt that the court found as a matter of fact that the parties agreed to the sale of Schedules 100, 102, 201 and 106.  The court wrote:

> The Court rules as it does because it finds that MLC and Tenet consummated a sale and purchase of Schedules 100, 102, and 201 on or about November 19, 1998, and a sale and purchase of Schedule 106 at some date prior to December 9, 1998, which means that after the aforesaid sales dates (a) MLC no longer owned the Schedules such that it had the legal ability to charge rent for the future use of the same, and (b) neither the instant debtor nor Tenet via said debtor owed an obligation to MLC under the Lease for the Schedules . . . .

Because there was no written contract, the determination of what the parties agreed to is a question of fact.[6]  Johnston the Florist, Inc. v. Tedco Constr. Corp., 657 A.2d 511, 516 (Pa. Super. Ct. 1995) ("[I]n the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the

---

[6]MLC's brief makes a fleeting reference to the UCC statute of frauds for the sale of goods, 13 Pa. C.S.A. § 2201.  Tenet answers that any statute of frauds defense was not raised below, and MLC's reply brief disavows reliance on such a defense.  Accordingly, we need not discuss this issue.

parties, are questions of fact to be resolved by the trier of fact. . . ."). We therefore review the district court's findings for clear error.

It is true that much of the testimony at trial focused on whether or not the equipment was sold. In contrast to its current position that there was a sale of the equipment, but not of the schedules, at trial MLC contended that it did not sell anything, but simply accepted the money in exchange for "forbearance."[7] MLC now agrees that there is sufficient evidence to support a finding that the parties agreed to sale of the equipment. At the same time, there is also sufficient evidence to support the finding that the parties also agreed to the sale of the lease schedules. The most explicit evidence is a November 6, 1998 letter from MLC's Norton to Tenet's Cranford, thanking him for "purchasing Schedule 106 as we discussed."

Moreover, trial testimony and documentary evidence support the bankruptcy court's finding that the parties considered the payments of $1.1 million and $250,000 to cover the obligation represented by the lease schedules. Cranford testified that Norton told him with regard to the $1.1 million payment "that it would be a lease termination which he felt [was] not subject to a sales tax." Cranford said Norton "assured me that the lease termination would terminate the lease and that MLC would not seek to reacquire the assets and would allow them to remain with Tenet." Later, when the parties negotiated a

---

[7]MLC argues that it raised the issue at trial about whether the schedules themselves were sold. Counsel made such an argument in closing, but the trial testimony of MLC's principal witness, Howard, focused on the contention that MLC did not sell the equipment.

10

transaction to cover the Schedule 106 equipment which had been overlooked earlier, Howard wrote Cranford a letter stating, "Enclosed is our invoice for the termination of the Schedule 106 Equipment. . . ." The invoice identified the lease number as "Schedule 106" and the description stated: "Termination Charge." On February 19, 1999, Tenet sent Howard a letter asking for confirmation that its payment for "termination" of the leases and acquisition of the equipment included all applicable sales taxes.

This evidence that MLC agreed to "terminate" the schedules supports the bankruptcy court's finding that the parties agreed that the lease schedules would be sold as part of the negotiated transactions.[8] Although in some other context there could be a meaningful distinction between expression of an intent to sell a lease and expression of an intent to terminate it, in this case, where the purchaser admittedly acquired the leased property, "termination of the lease" and "sale of the lease" are simply two ways to describe the same thing. The interpretation of language used in a contract, that is, the determination of what ideas a contract's language induces in other persons, is a question of fact. <u>Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 247 F.3d 44, 53 n.2

---

[8]MLC writes in its brief that Tenet could have protected itself from MLC's claim by including "a provision in the purchase agreement that, effective on its purchase, the lease schedules were <u>extinguished</u>." (emphasis added) In fact, Cranford testified that Norton said the leases would be "terminated," and MLC sent correspondence using the same word. "Extinguished" and "terminated" mean the same thing, at least in this context. Therefore, given the extensive evidence that the parties agreed to "lease termination," MLC's concession that an agreement to "extinguish" the schedules would have protected Tenet dooms its argument that the leases survived the sale of the equipment.

(3d Cir. 2001). The bankruptcy court's finding was not clearly erroneous.[9]

MLC argues that 11 U.S.C. § 365(d)(10) entitles it to payment of rent from the bankruptcy estate, but as the bankruptcy court held, section 365(d)(10) does not revive a right to rent payments for which the debtor is no longer liable. Once the schedules were terminated, MLC's right to payments under section 365(d)(10) died with them.

We have reviewed MLC's various related arguments and find them to be without merit.

For the foregoing reasons, we will affirm the judgment of the district court.

_____

TO THE CLERK:

Please file the foregoing not precedential opinion.

/s/ John R. Gibson
Circuit Judge

---

[9]MLC also argued in its opening brief that sale of the lease schedules would be "ineffective without 'perfection' under the UCC." However, in its reply brief, MLC retreated from this position, saying that it did not argue that sale of the leases without perfection would be invalid, but only that Tenet's failure to perfect was evidence there was no sale of the schedules. Whatever evidentiary value this fact may have does not render the bankruptcy court's finding clearly erroneous.