**LIVEWARE PUBLISHING, INC., Plaintiff,**

v.

**BEST SOFTWARE, INC., Defendant.**

**No. C.A.02–206–KAJ, C.A.02–356.**

United States District Court, D. Delaware.

March 21, 2003.

David Staats, Law Offices of David Staats, Wilmington, Delaware: counsel for Plaintiff.

Steven L. Caponi, Michael D. DeBaecke, Blank Rome LLP, Wilmington, Delaware: counsel for Defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. *INTRODUCTION*

Liveware Publishing, Inc. ("Liveware") filed this breach of contract and copyright infringement action against Best Software, Inc. ("Best") on March 19, 2002. (Docket Item ["D.I."] 1.) Presently before the Court are Best's Motion to Dismiss or, in the Alternative, Stay Proceedings Pending Arbitration (the "Motion") (D.I.17), and Best's application for an order requiring Liveware to treat as "Highly Confidential" certain information obtained by Liveware in response to a subpoena served on Best's mailing agent. (D.I.169.) The Court concludes that Best is entitled to arbitrate this dispute, at least insofar as the contractual claims are concerned, and that resolution of those contractual claims should be resolved before addressing other issues in the case. Accordingly, further proceedings in the case will be stayed pending the outcome of arbitration. The Court also concludes that the information Liveware obtained by subpoenae should be designat-

ed as "Highly Confidential" and treated as such pursuant to the terms of the Stipulation and Order of Confidentiality entered in this case (the "Confidentiality Order"). (D.I.87.)

## II. *BACKGROUND*

Best produces a payroll management software system known as "Abra Suite" which, until recently, included a report generating component that utilized software owned by Liveware. (*See id.* at ¶¶ 23, 30–31.) Liveware licensed that report generating component, known as "R & R Report Writer" ("R & R"), to Best under an agreement dated January 20, 2001 (the "License"). (*Id.* at ¶ 28.) According to Liveware's complaint, Best breached the License by failing to accurately report to Liveware the number of users of the Abra Suite product and by failing to pay the royalty sums that should have been paid upon an accurate count of users. (*See id.* at ¶¶ 33–34, 36–47, 53, 60.) Liveware asserts that, because it exercised its termination rights under the License, any and all use of R & R in Best's Abra Suite product after December 31, 2001 is unlicensed and therefore in willful violation of the copyright laws of the United States. (*Id.* at ¶¶ 63–68.) Among other things, Liveware seeks specific performance of Best's alleged obligations to provide end-user information, including the identity of end-users (*id.* at ¶¶ 88–93), a declaratory judgment that the provision in the License calling for the parties to arbitrate their disputes is void (*id.* at ¶¶ 110–21), as well as injunctive relief and statutory and compensatory damages.

Shortly after filing its complaint, and at approximately the same time it chose to serve it (*see* D.I. 16 at 7), Liveware sent an e-mail to certain companies doing business with Best as purchasers and distributors of Abra Suite (the "Business Partners"). (D.I. 18 at Ex. B.) The e-mail stated, in large-font, bold-faced type "Attention Abra Business Partners: Liveware has terminated Best Software's rights to distribute R & R Report Writer!!" (*Id.*) The e-mail announcement went on to state that it was "notice to all Abra/Best Business Partners that Liveware has brought legal action against Best ... [,]" and that, "[s]ince Best can no longer give you or your Abra Suite customers a valid sublicense to R & R, you *must* obtain an R & R license directly from Liveware ...." (*Id.;* emphasis in original.) At or about the same time, Liveware issued a press release announcing the lawsuit, describing its allegations against Best, and estimating its entitlement to damages to be fifteen million dollars. (*Id.* at Ex. C.)

Best, in turn, sought emergency injunctive relief against Liveware in this Court on March 29, 2002 (D.I.5), claiming that Liveware was tortiously interfering with Best's contracts with its Business Partners and was unlawfully threatening them with liability for copyright infringement. (*Id.*) After some discussion, at the TRO hearing, the Court [1] advised Liveware's counsel that "It's not a good idea to get customers in the middle of the fight. If you have a fight with the defendant, let's get it resolved.... I don't think it is a good idea to get the customers in the middle of it. I am not sure what legitimate business reason it serves other than to punish a defendant and put them at risk." (*Id.* at 12.) The Court went on to say, "I am prepared to, if your client doesn't voluntarily back

---

1. The TRO hearing was before the Honorable Roderick R. McKelvie, to whom this action was originally assigned. (D.I.3.) Judge McKelvie retired from the bench in 2002 and the case was then referred to Magistrate Judge Mary Pat Thynge. (*See* D.I. 43.) The present case assignment was made on January 6, 2003. (D.I.116.)

away from the marketplace ..., I am prepared to enter an order directing them to back away from it." (*Id.* at 13.)

By the conclusion of the TRO hearing, the parties, under the direction and encouragement of the Court, had worked out a temporary solution to the immediate problem, but the tone for this litigation had been set. Soon after the TRO hearing, the Court held a preliminary injunction hearing, at which Best and Liveware further argued their respective positions on whether Liveware should be enjoined from communicating with Best's Business Partners. (D.I.14.) The Court denied relief. (*Id.* at 77.) Liveware, evidently took that result to mean that involving customers in the parties' dispute was now a good idea, because on April 18, 2002, it broadcast an e-mail which it titled, "Open Letter to Abra Business Partners." (D.I. 19 at Ex. B.) The e-mail reminded Best's customers that Liveware was suing Best and then, after characterizing Best as attempting to "bully and intimidate" Liveware, encouraged the customers to consult counsel to "avoid potential liability" for participating in the infringement allegedly committed by Best. (*Id.*) Within the same message, Liveware then took a different but still direct shot at the business relationship between Best and the Business Partners, saying, "[o]ne positive aspect for Business Partners from this affair is that our contract calls for Best to turn over the list of Abra Suite/R & R licensees to Liveware at contract termination. When we get that list, we plan to share it with Business Partners in an equitable manner so that Abra Suite customers can enjoy the full range of services you offer." (*Id.*)

Its battle with Best in the marketplace apparently did not accomplish all it believed itself entitled to, so Liveware returned to the Court on May 1, 2002 with a motion for partial summary judgment and request that, on the basis of the record developed at the previous TRO and preliminary injunction hearings, the Court rule that the License had been terminated and that Best be "enjoin[ed] from violating Liveware's copyright ...." (D.I.20.) The following month, on June 20, 2002, Liveware filed an application for emergency relief, seeking to enjoin Best's efforts to take the parties' dispute to arbitration. (D.I.47.) In August, after discussing the matter with the Magistrate Judge who was then responsible for the case, Liveware withdrew that application. (D.I.72.)

In the meantime, in July, Liveware filed a separate but related action against another defendant in the United States District Court for the Eastern District of Pennsylvania. *Liveware Publishing, Inc. v. Human Resource Management Group, Inc.,* C.A. No. 02–6270–JD, and, two and a half months later, moved to transfer this action to the Eastern District of Pennsylvania for consolidation with the suit pending there. (D.I. 90 at ¶ 1.) The day after that motion was denied (D.I.117), Liveware once more sought a TRO, this time asserting that the Court should immediately intervene to prevent Best from illegally copying and distributing Liveware's software. (D.I. 119.)

Following full briefing on that most recent motion, including a sur-reply from Liveware (D.I.148), and the submission of affidavits, the Court heard argument on February 4, 2003. The Court again denied expedited relief on a truncated record, holding that Liveware had failed to show a likelihood of success on the merits, that Liveware had not shown irreparable harm, that the balance of hardships weighed against issuing a TRO, and that the interests of the public and third parties also weighed against giving Liveware the relief it sought. (D.I. 151 at 32–34.) The Court specifically noted that the existence of

rights under the License was at the heart of the dispute that Liveware was demanding be addressed. (*Id.* at 32–33.) At the close of the hearing, Liveware noted that it still sought a preliminary injunction and urged that a hearing be scheduled promptly. (*Id.* at 37–38.) Nevertheless, on March 10, 2003, Liveware appealed the denial of its TRO application. When, a week later, it was confronted with the consequence of the case being stayed pending resolution of the appeal, Liveware withdrew its appeal and again requested immediate injunctive relief. (*See* D.I. 167.)

In the most recent chapter in this contentious affair, Liveware served a subpoena on a third party who acts as a mailing agent for Best's communications with Abra Suite customers. (D.I. 169 at 1 and Ex. A.) Liveware then sent notice to Best that it had served the subpoena and, in response, counsel for Best immediately requested that Liveware provide a copy of the subpoena itself. (*Id.* at Exs. A & B.) Having received no response, counsel for Best repeated his request the next day. (*Id.*) Meanwhile, Best contacted its mailing agent and instructed it not to produce information until Best had had an opportunity to review it and determine whether it contained information subject to confidentiality protections. (D.I. 169 at 1.) Employees of the mailing agent who were unaware of that request from Best produced a mailing list of over 1,400 Best customers to Liveware in response to the subpoena. (*Id.*) During the time that Best's counsel was apparently trying to understand the scope of the discovery demand served on his client's mailing agent, Liveware's counsel refused to turn over a

copy of the subpoena and maintained that refusal until ordered to do so by the Court. (*See* D.I. 170 at 26–28; D.I. 169 at Exs. E & F.)

Throughout these proceedings, two things have been abundantly clear: Liveware badly wants to have Best's customer list, to which it believes it is entitled under the terms of the License (*see, e.g.,* D.I. 1 at *ad damnum* clause subpara. j; D.I. 170 at 15) [2], and Best badly wants this dispute to go to arbitration, to which it believes it is entitled under the License (*see, e.g.,* D.I. 16 at 5–7; D.I. 17; D.I. 163). Best asserts that its bargained for rights to have disputes with Liveware settled by arbitration have been unfairly frustrated by the foregoing procedural history. (D.I.163.) Best formalized its position regarding arbitration by filing the Motion, which has been fully briefed.[3] The argument over the information Liveware recently obtained by subpoena has been fully submitted on letter memoranda.

## II. *LEGAL STANDARD*

Best has posed it's motion as one for dismissal under Federal Rule of Civil Procedure 12(b)(1), or, in the alternative for a stay. (D.I.17.) A Rule 12(b)(1) motion calls into question the subject matter jurisdiction of the Court. The Motion would more properly have been brought under Rule 12(b)(6), because the existence of a valid arbitration clause does not technically deprive the Court of subject matter jurisdiction. It instead requires the Court to forego the exercise of jurisdiction in deference to the parties' contractual agreement to address in another forum those

---

**2.** In the Court's most recent teleconference with counsel in this case, counsel for Liveware was careful to note, "I would point out that in the complaint ... we asked for that customer list, which we have a right to under the contract provisions ...." (D.I. 170 at 15.)

**3.** The briefing again includes, in addition to the opening (D.I.18), answering (D.I.31), and reply briefs (D.I.36), a sur-reply from Liveware (D.I.73).

disputes which fall within the scope of the agreement to arbitrate. *Cf. Nationwide Ins. Co. of Columbus, Ohio v. Patterson,* 953 F.2d 44, 45 (3d Cir.1991) ("Dismissal of a declaratory judgment action because the dispute is covered by an arbitration provision is generally effected under Rule 12(b)(6) covering dismissals for failure to state a claim upon which relief can be granted, ... or Rule 56 covering summary judgments if matters beyond the pleadings were considered[.]"); Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 1350 at 196 ("[A] claim that the failure to arbitrate precludes the maintenance of an action cannot properly be raised on a motion to dismiss for lack of subject matter jurisdiction.").

Regardless of the rule cited, however, on a motion requesting the Court to defer to arbitration, the Court's attention is not generally directed in the first instance at dismissal but rather at the propriety of a stay. *See* 9 U.S.C. § 3 ("the court ..., upon being satisfied that the issue involved is referable to arbitration ..., shall on application of one of the parties stay the trial"). "Once ... [a valid arbitration] agreement is found, the merits of the controversy are left for disposition to the arbitrator." *Great Western Mortgage Corp. v. Peacock,* 110 F.3d 222, 228 (3d Cir.1997). In determining whether the parties have agreed to arbitrate, "there must be sufficient evidence that the parties consented to arbitration in an express agreement." *Medtronic Ave, Inc. v. Advanced Cardiovascular Systems, Inc.* 247 F.3d 44, 54 (3d Cir.2001). The Court's function is a very limited one. "It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *Id.* at 55.

As to Best's request that information obtained from its mailing agent be designated "Highly Confidential" under the terms of the Confidentiality Order, the Court has full authority to govern the compliance of the parties with its own orders and with the rules of discovery. *See* Ebbert v. DaimlerChrysler Corp. 319 F.3d 103, 118 (3d Cir.2003) ("discovery of course remains governed by the sound discretion of the District Court").

## III. *DISCUSSION*

### A. *Motion to Dismiss or Stay*

Section 13 of the License bears the heading "Exclusive Remedies" and provides, in pertinent part, as follows:

> Except for any matter for which injunctive relief is sought (as, for example, any infringement of Liveware's proprietary rights) or the determination of intellectual property rights (which, notwithstanding the provisions of this Section 13, shall be determined by the courts and under the law of the country chosen by the party claiming ownership thereof), the parties hereby agree that they will use those dispute resolution remedies explicitly set forth in this Section 13 in the event of any disagreement, dispute, breach or claim of breach, non-performance or repudiation hereunder. The entire transaction represented hereby and the structure and amount of the fees and other financial terms of this Agreement are based upon strict compliance with this Section 13, and the exclusive remedies set forth herein have been explicitly bargained for and negotiated and shall bind the parties as an integral part of this Agreement in accordance with the following terms and conditions[.]

(D.I. 18 at Ex. A, § 13(a).) The License then goes on, within the same section, to set forth in detail three steps for dispute resolution. First, the parties are to engage in an "internal resolution procedure" by which they correspond about their dis-

pute and meet in an attempt to resolve it or at least refine their positions with respect to it. (D.I. 18 at Ex. A, § 13(b).) Next, within twenty days of a failure to resolve the matter on their own, the parties are required to submit to mediation. (D.I. 18 at Ex. A, § 13(c).) Finally, in the event that mediation is unsuccessful, "the Dispute shall be resolved by mandatory, binding, arbitration in Washington, D.C. in accordance with the Commercial Arbitration Rules of the American Arbitration Association before a panel of three neutral arbitrators with knowledge of software licensing." (D.I. 18 at Ex. A, § 13(d).) "Dispute" is a defined term meaning, "any disagreement, dispute, breach or claim of breach, non-performance, or repudiation arising from, related to or in connection with this Agreement including, but not limited to, either party's failure or alleged failure to comply with any of the provisions of this Agreement[.]" (D.I. 18 at Ex. A, § 13(b).)

From the outset, Liveware knew that, as its relationship with Best deteriorated, Best was going to rely upon the alternative dispute resolution procedures set forth in Section 13 of the License.[4] (*See id.* at ¶ 115.) Moreover, Liveware recognized the weight and consequence of entering into such a specific and emphatic commitment to arbitrate the parties' disputes. In its complaint, it sought to avoid the consequences of its commitment by averring that it was duped into agreeing to arbitrate, that Best, already in breach of royalty reporting and payment obligations under a prior R & R license (D.I. 1 at ¶¶ 109–14), inserted the arbitration clause because it "secretly intended" that the clause "would insulate it from the consequences of its wrongdoing." (*Id.* at ¶ 110; *see also*

D.I. 14 at 41.) Yet, even while claiming that it should not have to abide by the alternative dispute resolution procedures laid out in the License, Liveware has with remarkable consistency shown a recognition that, at bottom, this is a commercial dispute centering on the parties' rights under the License.

Liveware's very first response to Best's argument for a TRO to stop Liveware from contacting Best's Business Partners was the assertion "that the license under which Best Software is using R & R Report Writer ... has been clearly terminated." (D.I. 16 at 4.) Liveware's arguments at the subsequent preliminary injunction hearing (D.I. 14 at 5) and at the TRO hearing again last month (D.I. 151 at 29), repeat the same theme: Best is an infringer because Liveware was entitled to and did terminate Best's rights under the License.

Ironically, Liveware's most recent accusation, expressed last week in a telephone conference with the Court, is not that Best is unlawfully using R & R but that Best has stopped using R & R. Liveware asserts that it is now being irreparably harmed because Best's customers will switch to a new "R & R-less" version of Abra Suite without being told that Liveware is waiting and willing to offer them a lower cost commercial alternative. (*See* D.I. 170 at 14–15.) Liveware's latest theory of irreparable injury is rooted in its assertion, already publicly expressed to Best's Business Partners (*see* D.I. 19 at Ex. B), that Liveware's rights under the License include the right to obtain Best's customer list upon termination of the License. (*See* D.I.170 at 15.) Nevertheless, despite repeated reliance on the License to justify its own actions and its own demands for

---

4. Section 13 and its alternative dispute resolution provisions are referred to as the "arbi-

tration clause" throughout this Opinion.

relief, Liveware has gone to extraordinary lengths [5] to prevent Best from having the benefit of the License when Best has attempted to invoke the arbitration provision to address the parties' differences. (*See* D.I. 31.)

Liveware's approach is fundamentally at odds not only with the content of the License itself but with the letter and spirit of the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. When the Court first addressed this matter in the context of the hearing on Best's motion for a preliminary injunction last April, it remarked that Liveware's theory was unlikely to be successful: "the courts recognize that arbitrations is [sic] a perfectly valid and enforceable method of resolving disputes. And to say that a plain vanilla agreement like this to provide for arbitration should be unenforceable because somebody was misled into it I think encourages a Court to undermine the value of arbitration . . . ." (D.I. 14 at 75.) [6]

Those comments are in keeping with the Supreme Court's categorical statement that, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Few things in the law have been the subject of so consistent and insistent language from Congress and the courts as the deference that should be given to contractual agreements to arbitrate. *See, e.g., 9 U.S.C. § 2* ("A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ("An order to arbitrate . . . should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."); *Sharon Steel Corp. v. Jewell Coal and Coke Co.*, 735 F.2d 775, 778 (3d Cir.1984) ("So long as the . . . claim of arbitrability was plausible, interpretation of the contract should have been passed on to the arbitrator.").

Despite that weight of authority, Liveware makes three arguments to stave off arbitration. First, it claims that one of its breach of contract claims stems from a previous contract that did not contain an arbitration clause. (*See* D.I. 31 at 13.) Second, it asserts that the alternative dispute resolution procedures set forth in Section 13 of the License are "narrow" and do not encompass its claims for equitable relief. (*See id.* at 13–17.) Third, it claims that its assertions that the arbitration clause was procured by fraud require discovery and trial before any arbitration can

---

**5.** Those lengths include, as previously noted, the filing of an application for a TRO to prevent Best from going forward with arbitration. (D.I.47.)

**6.** The Court went on to say that, at least preliminarily, it considered the matter of how the termination rights under the License could be exercised was a matter for the Court to determine, rather than a matter for arbitration. (D.I. 14 at 75–76.) The Court's musings in that respect were explicitly made subject to further consideration and the issuance of a formal order. (*Id.* at 77–78.) That order was not forthcoming. The present Opinion reflects the Court's first fully considered and formal look at the scope of the arbitration clause.

proceed. (*See id.* at 17–26) None of these arguments is sufficient to overcome the import of the arbitration clause.

■ As to its contention that one of its claims of breach, Count I, is not based on rights under the License but under an earlier agreement, the argument ignores that Count I can credibly be said to be at least "related to" rights under the License and therefore within the definition of "Dispute" in the arbitration clause. *Cf. Battaglia v. McKendry*, 233 F.3d 720, 724–25 (3d Cir.2000) (even without broadly inclusive "related to" language in arbitration clause, "arising under" language was sufficiently broad to require arbitration of issue before the court). In fact, Liveware itself has characterized the License as an "extension" of the rights under the preceding agreement. (D.I. 1 at ¶ 27.) It has also argued that, when the breaking point came between the parties at the end of 2001, the earlier agreements, as well as the License, were operative (D.I. 14 at 56), thus emphasizing a continuing inter-relationship of the License with its predecessor agreements and acknowledging that the arbitration clause was in effect when the dispute finally came to a head. *Cf. Lloyd v. MBNA America Bank, N.A.*, 2001 WL 194300 at *4 (D.Del.2001) ("Plaintiff's claim was 'in existence' when the Arbitration Section became effective, and plaintiff has presented no persuasive evidence to overcome the presumption that his claim is subject to arbitration."). To the extent there is any doubt that Count I is subject to arbitration, that doubt is resolved in favor of arbitrability.[7] *See Great Western Mortgage Corp. v. Peacock*, 110 F.3d 222, 228 (3d Cir.1997) ("doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration") (internal quotes omitted).

■ Liveware's second argument rests on the premise that claims for equitable relief for the infringement of its intellectual property rights are, by the terms of the License, not to be arbitrated. The Court agrees that, as Liveware asserts, Liveware had a right, and still has a right, to address such claims to this Court, since the License explicitly excepts them from the matters which must be addressed through alternative dispute resolution. It does not follow, however, that any claim for equitable relief must be heard before there can be an arbitration. Liveware's argument would effectively prevent arbitration of the parties' competing claims respecting termination rights under the License and their pre- and post-termination rights as well. Those essentially contractual claims are not within the explicit exception and are better understood as falling within the broad definition of "Dispute" set forth in the alternative dispute resolution clause itself. *See Medtronic Ave., Inc. v. Advanced Cardiovascular Systems, Inc.*, 247 F.3d 44, 55 (3d Cir.2001) ("federal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration.").

Moreover, those contractual claims ought to be resolved in the first instance if for no other reason than that decisions about the termination rights in the License will necessarily affect any determination of whether Best's actions were unlicensed and in violation of Liveware's copyright. An equally compelling reason to address the contractual claims first is that a contrary approach would allow a specific exception in the arbitration clause to swallow

---

7. Moreover, even if the Count I were not "related to" the rights under the License, the most that could be said for it is that it should be stayed pending arbitration, not that it should trump the arbitration rights granted in the License.

the rest of the rights in that clause, as has in fact been the case for the last year while Best has been attempting to gain the benefit of its bargained for rights to alternative dispute resolution. *See Harris v. Parker College of Chiropractic*, 286 F.3d 790, 793 (5th Cir.2002) (broad construction of exception to binding arbitration agreement would allow exception to "swallow up the arbitration agreement's rule").

This is not to say that no set of circumstances might exist under which the Court would proceed in the first instance to address a claim for injunctive relief. The parties' crafting of their arbitration clause might be said to have created a "chicken and egg" problem, leaving the Court to sort out which should come first, the right to injunctive relief for alleged infringement or the right to arbitrate the termination rights. It is impossible to say whether, presented with the full briefing of the parties' positions and a different set of circumstances, a weighing of those alternatives would result in a different assessment than the Court makes today. What can be said is that, given the circumstances of this case and the arguments the parties have advanced, the Court is satisfied that addressing the termination rights and related contractual issues in arbitration first is the appropriate path forward.

■ Liveware's final argument is that no action can be taken to enforce the arbitration clause without first giving it the right to discovery and a trial on its claim that the arbitration clause was fraudulently induced. (*See* D.I. 31 at 24.) The claim of fraudulent inducement is based on Liveware's allegations that Best deliber-

ately under-reported royalties due under the predecessor agreement to the License and that Best then, "being aware of the significant amount of sublicense under-reporting which it had committed ..., sought to introduce into the ... License ... provisions which would insulate it from the consequences of its wrongdoing." (D.I. 1 at ¶ 109.) The complaint goes on to focus primarily on the arbitration clause as the nefarious provision. (*See id.* at ¶¶ 110–11, 114–15, 120.)

In support of the proposition that arbitration must give way to action in this Court, Liveware cites Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, which states that, "[i]f the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof." It also relies upon the Third Circuit's opinion in *Sandvik v. Advent Internat'l Corp.*, 220 F.3d 99 (3d Cir.2000). Those authorities do not require the result that Liveware seeks, because the making of the arbitration agreement is not properly put in issue merely by an allegation that the clause was fraudulently induced.[8] Were that the case, every arbitration agreement could effectively be defeated by an assertion of fraud. *Cf. Battaglia*, 233 F.3d at 725 (citing *Flightways Corp. v. Keystone Helicopter Corp.*, 459 Pa. 660, 331 A.2d 184, 185 (1975), for principle that an agreement to arbitrate "cannot be circumvented by an allegation that the contract was void ab initio because of fraud in the inducement ...."). Such a "conclusory allegation could be inserted into any complaint involving fraud and arbitration

---

8. It is open to question whether Liveware's fraud claim meets the standard under Federal Rule of Civil Procedure 9(b) for pleading fraud with particularity. *See Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 173 n. 10 (3d Cir.2002) (particularity requirements of Rule

9(b), are met when the "complaint describes the circumstances of the alleged fraud with precise allegations of date, time, or place *or* by using some means of injecting precision and some measure of substantiation into their allegations of fraud.")(emphasis in original; internal quotes omitted).

and cannot be accepted at face value." *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1278 (6th Cir.1990).[9]

What the Court does give credence to is the explicit language of the clause itself, which says, among other things, that, "[t]he entire transaction . . . and the structure and amount of the fees and other financial terms of this Agreement are based upon strict compliance" with alternative dispute resolution provisions in the arbitration clause. (D.I. 18 at Ex. A, § 13(a).) To have meaning, that language must have greater weight than Liveware's post hoc, litigation-facilitating claim of fraud.

The Third Circuit's decision in *Sandvik* is not to the contrary. In that case, the court simply held that it was appropriate for the district court to determine the validity of the arbitration clause at issue. 220 F.3d at 100. That conclusion does not in any way suggest that a fraud-in-the-inducement claim automatically trumps an arbitration clause.

Despite Liveware's late attempt to deny the binding effect of the arbitration clause, the clause itself states that it was "explicitly bargained for and negotiated and shall bind the parties as an integral part of this Agreement[.]" (D.I. 18 at Ex. A, § 13(a).) Liveware does not deny the existence of the License and, indeed, demands satisfaction under it. The parties to the License are sophisticated businesses [10] which have demonstrated by their actions in this case that they are nothing if not aggressive in asserting their rights.[11] Liveware cannot escape the consequences of the bargain it struck by claiming it was duped into agreeing to arbitration. The existence of the arbitration clause is not fairly in issue in this case and the bargained for arbitration should proceed.

#### B. *Confidentiality of Best's Customer Information*

■ As previously noted, *supra* at 7, one of the central aims of Liveware throughout this litigation has been to obtain information identifying the end-users of Abra Suite. Through the use of aggressive third party discovery tactics and because of less than ideal communication between Best and its agent, Liveware's counsel has come into possession of information which Liveware otherwise would be entitled to, if at all, only following a determination of the substantive rights of the parties under the License. Liveware is frank to acknowledge that, in fact, that has been the effect of its actions. During the most recent teleconference with the Court concerning this matter, Liveware's counsel stated, "that information [i.e., the material produced by Best's mailing agent] is part of the customer list to which Liveware has a right under the contractu-

---

9. The Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), does not require this Court to eviscerate the arbitration clause in the License simply because Liveware claims fraud. The *Prima Paint* decision notes that, if a party claims fraud in the inducement of the arbitration clause, "the federal court *may* proceed to adjudicate it." *Id.* at 404, 87 S.Ct. 1801 (emphasis added). As noted herein, the bare claim of fraud is insufficient to put the existence and enforceability of the arbitration clause in issue.

10. Even when there is arguably great disparity in the bargaining powers of the parties to a contract, the courts give effect to a commitment to arbitrate. *Cf. Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 179–84 (3d Cir.1999) (upholding enforceability of arbitration clause in consumer contract for home improvements).

11. In fact, the parties have twice been admonished, by different judges, for their overzealous advocacy. (*See* D.I. 70 at 2–3; D.I. 151 at 34–35.)

al provisions [of the License]." (D.I. 170 at 23.) He went on to indicate how Liveware wanted to use the list: "it's important that Liveware contact these customers to prevent them from suffering ... harm ... [,]" presumably meaning the harm of Best converting its customers to a new version of Abra Suite without informing those customers of Liveware's desire to provide them a direct license to R & R. (*Id.* at 23–24.)

In light of the pleadings, the arguments, the admissions, and the maneuvers which have characterized this case, it is truly remarkable that Liveware would now assert that the customer list is not a trade secret subject to confidentiality protections and that there would be no harm to Best if Liveware were to use the list freely. (*See* D.I. 171 at 2–3.) But that is Liveware's assertion and it requires a brief response.

The contention that the customer list is not confidential information is wholly at odds with the evidence. It is precisely the type of business information which is regularly accorded trade secret status, *see, e.g., SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1258 (3d Cir.1985) (customer lists are a "subject matter that has long been protectable as trade secrets under Pennsylvania law"); *Delaware Exp. Shuttle, Inc. v. Older,* 2002 WL 31458243, *18 (Del.Ch.,2002) (a customer list is a trade secret if it derives "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[;]" citing 6 *Del. C.* § 2001(4)); *Lamorte Burns & Co. v. Walters,* 167 N.J. 285, 770 A.2d 1158, 1166 (2001) ("In New Jersey, customer lists of service business have been afforded protection as trade secrets."), and Best's treatment of it as valuable and confidential information has indisputably been a driving factor throughout the litigation. As to Liveware's argument that no harm will accrue to Best by the disclosure of the information, suffice it to say that Liveware's own intense and oft-stated desire to have the list for commercial advantage belies that assertion.

The tools of discovery are to be used, "to secure the just, speedy, and inexpensive determination of every action." Fed. R.Civ.P. 1. They are not to be used to acquire indirectly the very relief that is supposed to await the determination of the action on the merits. When information, such as the customer list at issue here, is confidential and subject to misuse by a litigant, it is appropriate for the Court to order that the information be made subject to a protective order and be available only to trial counsel. *See Scovill Mfg. Co. v. Sunbeam Corp.,* 61 F.R.D. 598, 602 (D.Del. 1973). Accordingly, Best's request that the information be treated by both parties as "Highly Confidential" under the Confidentiality Order will be granted.

## IV. CONCLUSION

For the foregoing reasons, Liveware will be ordered to comply with the provisions of Section 13 of the License and this matter will be stayed pending the outcome of arbitration or further order of the Court. Liveware will also be directed to mark as "Highly Confidential" the information received from Best's mailing agent and to treat it as such in accordance with the terms of the Confidentiality Order.

An order will issue.