**Opinions of the United States Court of Appeals for the Third Circuit**



12-29-2005

# Mash Entr Inc v. Prolease Atl Corp

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-1821

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Mash Entr Inc v. Prolease Atl Corp" (2005). *2005 Decisions.* Paper 36.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/36

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos:  04-1821/3422
_____

MASH ENTERPRISES, INC, f/k/a HUMAN RESOURCE OPTIONS,
INC.; PROFESSIONAL LEASING CONCEPTS, INC.

v.

PROLEASE ATLANTIC CORPORATION; PROFESSIONAL STAFF LEASING
CORPORATION; BALAJI RAMAMOORTHY, a/k/a Bala Ram; REBECCA
RAMAMOORTHY, a/k/a Becky Ram; ASPI IRANI; ALBERT HAWK;
CHARLES EHRIG

v.

HOWARD VOGEL; MARK FRIED, Counter Defendants


Mash Enterprises, Inc., f/k/a Human Resources Options, Inc.,
Howard Vogel, and Mark Fried,

Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District No. 01-cv-02437
District Judge: Honorable Robert F. Kelly
_____

Argued July 12, 2005

Before: SLOVITER, McKEE, and ROSENN, Circuit Judges

(Filed: December 29, 2005 )

James M. Becker (Argued)
Mark C. Cawley
Saul Ewing
1500 Market Street
Centre Square West, 38th Floor
Philadelphia, PA 19102

      Counsel for Appellant (Howard Vogel, etc.)

Philip B. Zipin (Argued)
Neil R. Lebowitz
Zipin, Meleny & Driscoll
8403 Colesvile Road, Suite 610
Silver Spring, MD 20910

      Counsel for Appellant (Mark Fried, etc.)

Tamir D. Damari (Argued)
Stanley H. Goldschmidt
Law Offices of Stanley H. Goldschmidt
1025 Connecticut Avenue, N.W., Suite 220
Washington, DC 20036

      Counsel for Appellees

_____

OPINION OF THE COURT
_____

ROSENN, Circuit Judge.

Appellants Mash Enterprises ("MASH"), Howard Vogel, and Mark Fried appeal from the District Court's judgment arising out of a contract to sell the assets owned by MASH to ProLease Atlantic Corporation ("ProLease Atlantic"). The District Court, following a bench trial, concluded that ProLease Atlantic owed nothing more under the

2

contract and, after accounting for various set-offs to which it is entitled, had actually overpaid $2,450.00. The Court further found fraud and negligent misrepresentation on the part of Vogel and Fried and awarded ProLease Atlantic $316,330 attorney's fees and costs (as the prevailing party in the litigation under Paragraph 28 of the asset Purchase Agreement). Because we believe the District Court overlooked or misconstrued certain major provisions of the contract that we discuss below, we vacate the judgment of the District Court and remand for further proceedings with respect to the amount due on the promissory note and the amount due ProLease Atlantic for costs and attorney's fees.

I.

We have diversity jurisdiction under 28 U.S.C. § 1332 and the parties agree that Maryland law governs this dispute. We exercise plenary review over the District Court's legal determinations and review factual conclusions for clear error. *Kosiba v. Merck & Co.*, 384 F.3d 58, 64 (3d Cir. 2004).

Because we write primarily for the parties who are familiar with the facts and procedural background of this case, we will reiterate only those facts that will be useful to our discussion.

Both parties are professional employer organizations; that is, they provide human resource services for other companies. They become the nominal employer of a client's employees, providing payroll, health benefits, and insurance. They then lease the employees back to their clients. Under the purchase agreement, MASH sold ProLease

3

Atlantic the right to administer the employees of MASH's clients. ProLease agreed to pay MASH on what was essentially a per employee basis for each transferred employee it had been administering. The parties dispute the number of employees to be paid for under the Purchase Agreement.

In ascertaining whether MASH breached its purchase agreement with ProLease Atlantic, it is important to note that both parties were professional employer organizations experienced in that business. They played on the same level field, and each knew that because of the nature of their business it would be impossible to determine accurately the number of employees to be transferred from MASH to ProLease Atlantic as of the sale date of June 30, 2000.

Because of this uncertainty in accurately fixing the number of employees at the time the purchase agreement was executed, the parties provided for a six month recalculation or "look-back" period to give ProLease Atlantic a sufficient opportunity to ascertain the exact number of employees that were transferred to it in the sale. ProLease Atlantic's payment of only half of the tentative purchase price and its promissory note for the balance lent itself to such adjustments. To that end, the contract provided that if ProLease Atlantic determined during this Recalculation Period that fewer than 97% of the eligible employees remained on ProLease Atlantic's payroll the principal balance of the Promissory Note would be reduced. It further provided, as the District Court found, that "[i]n the event of a diminution of the principal balance of the Promissory Note . . .

4

ProLease Atlantic was to deliver to [MASH] an Allonge to the Promissory Note setting

forth the new principal balance."[1]

Thus, under the contract, MASH yielded to ProLease Atlantic the opportunity to

---

[1]The District Court summarized the Purchase Agreement:

> The purchase price for the Purchased Assets . . . was . . . the product of $1250 and the number of "Eligible Employees" on [MASH's] payroll on the date of Closing.  The Purchase Price was also subject to certain adjustments . . .
>
> If, within one hundred eighty (180) days following the closing of the transaction ("the Recalculation Date"), ProLease Atlantic determined that less than 97% of the Eligible Employees remained on ProLease Atlantic's payroll, the principal balance of the Promissory Note would be reduced by the product of $1250 and the difference between:  (1) 97% of the Eligible Employees and (2) the number of the Eligible Employees on ProLease Atlantic's payroll as of the Recalculation Date (the "Reduction Formula").  In the event of a diminution of the principal balance of the Promissory Note under the Reduction Formula, ProLease Atlantic was to deliver to [MASH] an Allonge to the Promissory Note setting forth the new principal balance of the Promissory Note based upon the application of the Reduction Formula (the "Post-Reduction Amount").  [MASH] also had the right to review ProLease Atlantic's records to verify the accuracy of ProLease Atlantic's calculation of the Post-Reduction Amount.  (The 180 day period following the Closing was also referred to at trial as the "look-back period"). . . .
>
> The term "Eligible Employee" was defined in Paragraph 2(a) of the Purchase Agreement:  The Eligible Employees shall be those employees who shall work at least thirty (30) hours per week and shall have been on the Seller's payroll for at least twelve (12) weeks prior to the Closing. *MASH Enters. v. ProLease Atl. Co.*, 2004 WL 405794, at *1-3 (E.D. Pa) (footnotes omitted).

5

adjust the balance on the note "based upon the application of the Reduction Formula," subject to MASH's "right to review ProLease Atlantic's records to verify the accuracy of ProLease Atlantic's calculation of the Post Reduction Amount." Paragraph 2 of the contract also provided for additional adjustments to the purchase price based upon client contracts entered into by MASH which had not begun as of the purchase date. The contract noted that more than one allonge may be necessary because of these contracts. Fried testified, *inter alia*, that the purpose of the recalculation provision was to give the buyer comfort that at the end of 180 days it could review the number of employees transferred and "make any adjustments, if necessary, to the purchase price."

These provisions and testimony make it very clear that the number of employees and purchase price set forth in the contract were only tentative, subject to review and recalculation of the principal balance. Both parties understood that the ultimate amount due on the note was subject to modification after the "look-back" period of six months.

II.

The contract is explicit and unqualified with respect to the calculation of the number of employees "on the Buyer's Payroll" as of November 28, 2000. Employees who worked less than thirty (30) hours per week were designated as "Part-time Employees" and also would be counted as "Eligible Employees" subject to certain limitations. (See Purchase Agreement 2A, A 85).

6

The parties understood that the nature of the business made it difficult to fix accurately the number of employees to be transferred at time of closing. Witnesses from both parties agreed that it was difficult to determine the number of employees that should be paid for. After the 180-day Recalculation Date, ProLease Atlantic gave notice that the number of employees was only a little more than half of the employees tentatively called for in the contract. ProLease Atlantic also advised MASH that it was further reducing the amount owed under the promissory note to account for various set-offs, including overpaid insurance and administrative fees.

The District Court agreed with ProLease Atlantic that the correct number of employees under the contract as of the Recalculation Date was 1,853, and reduced the amount owed on the promissory note accordingly. On appeal, MASH only disputes the District Court's number by 268 employees, arguing that the lower court clearly erred by excluding employees who were on ProLease Atlantic's payroll as of the recalculation date. The District Court excluded these employees on the basis that those clients had notified MASH before the Recalculation Date that they would terminate their contracts with ProLease Atlantic before the end of the current year. ProLease Atlantic, however, processed each client's payroll until the end of the year, which was after the Recalculation Date. Although ProLease Atlantic's contracts with these clients were eventually terminated, the uncontroverted evidence proves that the employees of these clients

remained on ProLease Atlantic's payroll until after the Recalculation Date.[2] (D. Ct. Op. at 4, 8-9). That is all the contract required; that was the negotiated deal.

There is no reason to exclude clients whose contracts were terminated, or who gave notice of termination, before or after the Recalculation Date.[3] ProLease Atlantic attempts to obscure the clear language of the contract by arguing in terms of "active employees," "current employees," and "terminated employees." None of these terms are used in the Purchase Agreement in calculating the reduction in the purchase price. The officers of ProLease Atlantic testified that "business logic" dictates that the company should refuse to pay for clients that would soon be terminated. That understanding, however, was not asserted during the negotiations or reflected in the Purchase Agreement. The contract language is unmistakable; the Buyer's payroll is to determine the number of employees eligible to be counted. No other method of measuring the number of employees for the reduction in purchase price is given in the contract.

---

[2]It is unclear whether the employees of Ventresca, one of the companies excluded under this methodology, should be counted as Eligible Employees under the contract. The parties agreed in the amendment to the Purchase Agreement that ProLease Atlantic would not purchase the contracts of Fried's company, PLC. ProLease Atlantic argues that Ventresca was a client of PLC and MASH fails to address this contention (Reply at 8). Whether the Ventresca employees were part of the assets purchased by ProLease Atlantic must be determined by the District Court on remand.

[3]It appears that at least one of the excluded clients gave notice of termination after the Nov. 28, 2000 recalculation date. Robinson Pallet notified ProLease Atlantic that it would terminate its relationship on December 1, 2000.

In any case, although ProLease claims to have "terminated the contract" with Aquahab prior to the recalculation date by an exchange of letters, this only meant that the contract would not be renewed for the next year. ProLease did not cease to provide services for Aquahab and Aquahab did not stop paying for them. The true "effective" end date of the contract between ProLease and Aquahab was Dec. 31. If ProLease had taken the Aquahab employees off of payroll, then the employees would not have been counted under the Purchase Agreement. Rather than focus on the legal relationship between ProLease and Aquahab, the Purchase Agreement was concerned with their functional relationship–that is, whether ProLease was processing the client's payroll.

The District Court's opinion offers no justification for its decision to exclude these employees from the list, except that ProLease Atlantic's expert did so.[4] However, the expert excluded those employees because ProLease Atlantic directed him to do it.[5] The District Court's inquiry extends only to the details of whether the clients were terminated for good cause before the Recalculation Date. (D. Ct. Op. at 8-9). The Court never challenged the rationale for excluding these "terminated" employees in the first

_____

[4]Charles Lunden, ProLease Atlantic's expert, stated that he excluded the employees because his client told him to, telling him those "clients had terminated prior to the expiration of the look back period and to the extent they were on the payroll, this was done for the convenience of the clients."

[5]When pressed for its reason for the exclusion, ProLease Atlantic could only point to its own interests: "My logic for [the exclusion] is I paid – $1250 was the purchase price per full employee . . . . So, in my opinion, I'm not going to pay $1250 as a logic – business logic to Mr. Howard Vogel . . . for a client that's not going to be there."

9

place.

ProLease Atlantic's argument on appeal is that the phrase "on the Buyer's payroll" is ambiguous. The phrase is not ambiguous in any sense. "[O]n the Buyer's payroll" clearly refers to all eligible employees as of the agreed date. The parties, all in the same type of business, chose the phrase for its specificity. They were not neophytes in this industry. ProLease Atlantic did not represent in the District Court that the phrase was unclear in any way, and the District Court did not even hint at the possibility of ambiguity in the phrase.

The Purchase Agreement provides absolutely no basis to exclude clients who had indicated their intent to terminate prior or after the Recalculation Date. The purpose of the date was to determine how many customers ProLease Atlantic was still serving 180 days after the sale, not how many it would be serving at any other date. The contract makes no distinctions between long-term clients and those for whom November or December would be their last month on payroll. The only way to reduce the number of employees under the contract is to reduce "the number of Eligible Employees on the Buyer's payroll at the Recalculation Date." (Purchase Agreement 2d(i)). Because ProLease Atlantic continued to process the payroll for those clients that had determined to end their relationship at year's end, those clients, numbering 268, must be counted under the contract language.

III.

The District Court concluded that Vogel and Fried, the joint owners of MASH, were liable to ProLease Atlantic for fraud. The court reached this conclusion on the ground that they failed to disclose (1) that the group health insurance policy included employees of a company not sold to ProLease Atlantic; (2) that they had permitted some clients, so they could obtain insurance benefits, to falsely designate relatives and acquaintances as employees which also caused ProLease Atlantic to pay extra in premiums; and (3) they inflated the number of Eligible Employees sold to ProLease Atlantic.

Under Maryland law, a fraud judgment must be supported by clear and convincing evidence that the material misrepresentation was made with knowledge of the statement's falsity and with intent to defraud. Dross v. Sussex, Inc., 630 A.2d 1156, 1161 (Md. 1993). There is insufficient evidence in this record to support a finding by clear and convincing evidence that either Vogel or Fried knowingly or recklessly misrepresented the number of employees or made misstatements about the employees under the health plans. The evidence is particularly lacking with respect to Vogel. The exaggerated number of employees to be transferred under the tentative provision of the Purchase Agreement is not sufficient proof of fraud under the circumstances of this transaction.

The District Court focused on Fried's failure to make an accurate client list at the time of sale. The entire fraud holding is based on the finding that given "the extent of the inaccuracy in the eligible employee Client List the conclusion is inescapable that [Fried

11

and Vogel] had to have [inflated the number of employees] knowingly." We can find no trial testimony of Vogel's involvement in compiling this list. Moreover, witnesses for both sides testified about the difficulty to discern the number of "Eligible Employees," as called for in the contract. Further, although the Court assumed that the Client List was incorrect at the time of sale, it made no finding and, apparently, no analysis at all of what was the correct number as of that date. The expert testimony that the District Court accepted was based on payroll records commencing after the closing date. Both parties recognized that the exact number of employees would not be fixed at the time of the sale, but only after the "look-back" period, 180 days later. The contract assumes the initial list would be inaccurate.

Finally, there was no evidence that Vogel or Fried attempted to conceal anything which cast doubt on their representations to ProLease Atlantic. Before the closing, MASH generated a client list to support its calculation. The contract explicitly provided that ProLease Atlantic could recalculate the number of employees based on MASH's records, reduce the purchase price accordingly, and gave ProLease Atlantic 180 days to do it. This generous provision does not support fraud but demonstrates candor and openness. Furthermore, Vogel testified that he and Fried "left everything" to ProLease Atlantic after the asset transfer, including "all files, all paperwork . . . we literally walked away from that office and the business, and we left everything intact, the computers, everything." Vogel and Fried provided ProLease Atlantic with multiple opportunities and

12

adequate time to discover the precise number of employees transferred and to lower the purchase price accordingly. Both parties structured the transaction on this basis.

Although ProLease Atlantic had the right to rely on their representations, Vogel and Fried did not behave as though they had knowingly made false statements about the material facts with the intent to defraud ProLease Atlantic. The District Court pointed to no clear and convincing evidence sufficient to support an inference of knowledge of misstatement and intent to defraud. It merely made an assumption because of the differences in the numbers asserted at the time of sale and the final number after the Recalculation Date. The mechanism for reducing the price in the purchase agreement itself demonstrates that the parties anticipated these differences might occur.

However, the evidence is sufficient to support the District Court's finding of negligent misrepresentation. Under Maryland law, a contractual relationship may give rise to a duty of care. See Walpert, Smulliam & Blumenthal, P.A. v. Katz, 762 A.2d 582, 589 (M.D. 2000). Vogel does not contest the District Court's conclusion that he and Fried owed ProLease Atlantic a duty of care. The contract contained an acknowledgment that ProLease Atlantic was relying on their representations. (Purchase Agreement 6(u)). ProLease Atlantic has also proved proximate damages, because, at minimum, the misstatements of fact regarding the health insurance plans caused ProLease Atlantic to overpay on insurance premiums.

There remains whether the false statements were made negligently. Although

there is insufficient evidence to prove Vogel and Fried made intentional misrepresentations for the purpose of defrauding ProLease Atlantic, the evidence is sufficient to support the District Court's findings that their conduct amounted to negligence.

Although we reverse the District Court's finding of fraud and affirm the finding of negligent misrepresentation, this has no effect on the amount of money due either party. Under the Purchase Agreement MASH is entitled to the correct purchase price and ProLease Atlantic is entitled to the off-sets as determined by the District Court.

IV.

There is little law in Maryland on how to determine the prevailing party in a contractual dispute when both parties have prevailed on some claims and not on others. As we have stated before, "[u]sually a common-sense comparison between relief sought and relief obtained will be sufficient to indicate whether a party has prevailed." Institutionalized Juveniles v. Sec'y of Pub. Welfare, 758 F.2d 897, 911 (3d Cir. 1985). Therefore, prevailing party status may be decided independently of the party for whom judgment is actually awarded. *Id*.

Although MASH has prevailed in the matter of the 268 excluded employees, which may amount to a maximum of $335,000, and in the fraud claim, we uphold the District Court's finding that ProLease Atlantic is the prevailing party and is, under the contract, entitled to fees and costs. ProLease Atlantic is entitled to set-offs of about

14

$231,933, as calculated by the District Court.  MASH claimed the full amount still due under the contract, which amounted to $1,915,316 and ProLease Atlantic sought to rescind the contract or reduce the amount due from $1,915,316 to $25,531.  After the set-offs, the most ProLease Atlantic could owe to MASH is about $103,067.  This represents only about 5% of what MASH claimed was still due under the contract.

ProLease Atlantic is the prevailing party, but that does not mean it is automatically entitled to a full recovery of its legal fees and costs.  The Purchase Agreement provides that the "prevailing party in any legal proceeding between the parties to this Agreement shall be entitled to its attorneys' fees and costs."  (Purchase Agreement ¶ 28)  There is no mention of reasonableness.  In contrast, the indemnification clause in the Purchase Agreement provides in relevant part that MASH, Vogel, and Fried shall indemnify ProLease Atlantic "from and against any and all costs, losses and damages (including reasonable expenses and reasonable legal fees), resulting from or arising out of," inter alia, any misrepresentations made by MASH, Vogel, and Fried.  (Purchase Agreement ¶ 11) (emphasis added).

Under Maryland law, when a fee application is made pursuant to a contractual right, a court must examine the request for reasonableness, even if the contract contains no such requirement.  See, e.g., Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co., 844 A.2d 460, 478 (Md. 2004) ("Where an award of attorneys' fees is called for by the contract in question, the trial court will examine the fee request for reasonableness,

15

even in the absence of a contractual term specifying that the fees be reasonable."). Accordingly, the District Court must evaluate ProLease Atlantic's attorneys' fees and costs request for reasonableness.

Both MASH and ProLease Atlantic assume that only one of them will be a prevailing party, and their arguments are limited to the issue of which one of them has prevailed. The parties fail to address *how much* the prevailing party is entitled to if it has not prevailed on all of its claims. The Purchase Agreement provides no direction on how to calculate the prevailing party fees and costs when the parties have only partially prevailed on their claims. Neither party proposes, at least to this Court, that the prevailing party award should be limited to fees and costs incurred in relation to the specific claims on which they were successful.

MASH prevails on its breach of contract claim to the extent that it is entitled to payment on the Promissory Note for approximately 268 employees that were on ProLease Atlantic's payroll at the Recalculation Date. This may amount to approximately $325,000 award for MASH under the promissory note. In all other respects, ProLease Atlantic prevailed on its breach of contract claim against MASH. Indeed, MASH concedes that ProLease Atlantic is entitled to a 77% reduction in the promissory note to account for the attrition in Eligible Employees at the Recalculation Date and for various overcharges and uncompensated services.

In sum, ProLease Atlantic is the prevailing party because MASH has been largely

16

unsuccessful in its claims against ProLease Atlantic, and ProLease Atlantic succeeded in having the balance on the promissory note reduced substantially as a result of this litigation. However, because ProLease Atlantic does not prevail on every aspect of its breach of contract claim, or on its fraud claim, we remand this matter to the District Court with directions to re-evaluate the reasonableness of the award of attorneys' fees and costs.

V.

For reasons that follow, we vacate the judgment of the District Court and remand for further proceedings consistent with this opinion with respect to the amount due on the promissory note and the amount due ProLease Atlantic for costs and attorney's fees.

SLOVITER, Circuit Judge, Dissenting.

Unlike my colleagues, I would affirm the judgment of the District Court as to both the breach of contract and fraud determinations. I would hold that the fact findings made by the District Court after a three-day bench trial were not clearly erroneous.

The majority's decision rejecting the District Court's holdings that MASH breached its contract and that MASH, Fried, and Vogel committed fraud is based on the majority's interpretation of one phrase in one sentence in the contract. That phrase, which set the final sale price on the number of employees who remained "on ProLease Atlantic's payroll" on the Recalculation Date, is ambiguous and should be construed in the context of the surrounding circumstances. The majority's conclusion is reached without any discussion, much less analysis, of the unchallenged facts and circumstances.

## I.

As the majority notes, ProLease Atlantic, a professional employer organization which like MASH hired its clients' employees, leased them back to the client-companies, and provided payroll, tax and employee-benefit services to those companies, purchased substantially all of the assets of MASH. Those assets consisted of the number of "Eligible Employees" on MASH's payroll at the time of closing, at the price of $1,250 each. ProLease Atlantic agreed to pay one-half of the purchase price at closing, and to provide a promissory note for the remaining balance. The Purchase Agreement also provided that if within 180 days following the close of the transaction (the "Recalculation

18

Date") ProLease Atlantic determined that less than 97% of the Eligible Employees remained on its payroll, the principal balance of the Promissory Note would be reduced by the product of $1,250 and the difference between 97% of the Eligible Employees represented at closing and the number of Eligible Employees on ProLease Atlantic's payroll as of the Recalculation Date (the "Recalculation Formula").

MASH, Fried and Vogel jointly and severally represented that (1) the Client List attached to the Purchase Agreement was correct and current; (2) there were no pending claims against MASH for federal, state and local taxes, and that all taxes which might accrue up to the closing date would be paid by MASH; (3) no material misstatements or omissions were made; and (4) all representations in the Purchase Agreement were made with the knowledge and expectation that ProLease Atlantic was placing substantial reliance thereon. MASH, Fried and Vogel further agreed to indemnify ProLease Atlantic for up to four years following the closing for, inter alia, a breach of any of their warranties arising from the transaction. The Purchase Agreement entitled ProLease Atlantic to set off any amounts that MASH owed it against any amounts it owed on the Promissory Note.

At closing, MASH represented to ProLease Atlantic that there were 3,307 Eligible Employees, yielding a purchase price of $4,133,750. ProLease Atlantic paid MASH $2,066,875 (one half of the purchase price) and executed a Promissory Note for the remaining $2,066,875. MASH also provided a "Reaffirmation of Seller's

Representations and Warranties," by which it re-affirmed the representations and warranties contained in the Purchase Agreement.

On October 2, 2000, ProLease Atlantic made the first payment under the Promissory Note in the amount of $151,558.69. Thereafter, ProLease Atlantic discovered that MASH had breached many of the representations and warranties contained in the Purchase and Letter Agreements: (1) MASH, Fried and Vogel overstated the number of MASH's Eligible Employees at the time of closing, thereby artificially inflating the purchase price (in fact, at the end of the Look-Back Period, ProLease Atlantic discovered that the number of Eligible Employees was far lower than the 3,307 represented by MASH in the Purchase Agreement); (2) ProLease Atlantic paid $6,132.92 in delinquent taxes attributable to one of MASH's affiliates, despite representations that MASH would pay all taxes that might accrue prior to closing; (3) ProLease Atlantic overpaid health insurance premiums in the amount of $106,806.71 on behalf of PLC's employees who by the terms of a Letter Agreement, were not part of the transaction; (4) MASH failed to disclose to ProLease Atlantic that it had instituted a policy whereby the employees of MASH's clients were permitted to falsely designate their relatives and acquaintances as "employees" of MASH such that these individuals could be included on MASH's health insurance policies (ProLease Atlantic continued to pay health insurance premiums for these individuals, who were not employees, after the transaction, resulting in a financial loss of $39,845.54); (5) Fried caused ProLease Atlantic to pay workers' compensation

premiums for PLC employees amounting to $45,935.62; and (6) ProLease Atlantic was not reimbursed for the $33,212 it expended in administering PLC's payroll and benefits (an amount MASH had agreed to pay).

Because ProLease Atlantic did not pay further on the Promissory Note, MASH filed suit with multiple claims which were essentially reduced to a breach of contract claim against ProLease Atlantic and its fraud claim against ProLease Atlantic and its officers and employees. After a three-day bench trial, the District Court, in the portion of the order relevant here, found in favor of ProLease Atlantic on MASH's breach of contract claim and found in favor of ProLease Atlantic on its set-off claim, see Mash Enterprises, Inc. v. ProLease Atlantic Corporation, No. 01-2437, 2004 WL 405794 (E.D. Pa. March 4, 2004) (hereafter cited as Mash Enterprises), and counterclaims for breach of contract, fraud and negligent misrepresentation. The remedy for the breach of contract, fraud and negligent misrepresentation claims were the same. The District Court determined that ProLease Atlantic did not owe MASH any amount under the Promissory Note, and, in fact, had overpaid in the amount of $2,540.

## II.

The most significant of the District Court's findings of fact for our purposes is its finding that as of the Recalculation Date there were 1,853 Eligible Employees on ProLease Atlantic's payroll, a far cry from the 3,307 represented by MASH in the Purchase Agreement. In reaching this figure the District Court relied on the testimony by

ProLease Atlantic's expert witness Charles S. Lunden.  The majority discounts Mr. Lunden's testimony for no reason that I can see.  Lunden is a graduate of the University of Pennsylvania with a major in Accounting and is a Certified Public Accountant.  He is accredited in Business Evaluations by the American Institute of CPAs, he is a Certified Fraud Examiner, a Certified Life Underwriter and a Certified Management Accountant.  He has testified as an expert in various State and Federal Courts as to Business Evaluations and measures of damages.  See Mash Enterprises, 2004 WL 405794, at *6. Fried, although now employed by ProLease Atlantic, testified in support of MASH.  The District Court found that Fried's method of calculation "was unreliable," id. at *7, and that "Mr. Lunden's conclusions are much more reliable."  Id. at *6.  The basis for Lunden's calculation is set forth fully in the District Court's unreported opinion.  Id. at *3-*5.

Significantly, MASH does not appeal from the District Court's finding that MASH's representation of the number of Eligible Employees was 1,454 employees too many.  Nor does it dispute that ProLease Atlantic was entitled to each of the various set-offs found by the District Court.  Its sole argument is that the District Court erred in its construction of § 2(d) of the Purchase Agreement,[6] by excluding 268 Eligible Employees

---

[6]Section 2(d) of the Purchase Agreement provides that:

In the event that within one hundred eighty (180) days following the Closing (the "Recalculation Date"), the Buyer determines that less than ninety-seven (97%) of the Eligible Employees . . . are then on the Buyer's payroll, the outstanding value of the promissory Note shall be reduced by an

of employers Aquahab and Littman and Boca, Robinson-Pallet, South Jersey Paper, Trenton Corrugated and Ventresca (the "Disputed Companies"), from its calculation of the Eligible Employees as of the Recalculation Date. MASH contends that if these Eligible Employees were included in the Recalculation Formula, ProLease Atlantic would remain liable for $326,729.08 on the Promissory Note. MASH's position is a telling admission of the extent of its initial representations, or more precisely, misrepresentations.

**III.**

Turning then to the 268 employees on whom the majority focuses, I would agree with the District Court's determination for the following reasons:

A.

The Exclusion of 133 Eligible Employees of
Aquahab and Littman

The District Court excluded 133 Eligible Employees of Aquahab and Littman (because Aquahab and Littman are affiliated companies, they will be referred to collectively as "Aquahab") from the Recalculation Formula relying in large part on paragraph 2(f) of the Purchase Agreement, which provides that Prolease Atlantic has the

---

amount (the "Reduction Amount") equal to the product of (i) [$1,250] and (ii) the difference between (1) [97%] of the Eligible Employees (the "97% Figure") and (2) <u>the number of Eligible Employees on the Buyer's payroll</u> as of the Recalculation Date.

App. at 90-91 (emphasis added).

right to terminate any Client Contracts prior to the Recalculation Date "for the same reason that it terminates its own client contracts."[7]

As a preliminary matter, it is significant that MASH plainly misstated the number of Aquahab's Eligible Employees at closing. Whereas the submitted client list indicated that Aquahab had 325 Eligible Employees at closing, it is undisputed that there were only 133 Eligible Employees during the look-back period.

In early November 2000, ProLease Atlantic, having determined that its relationship with Aquahab was unprofitable (due to certain risk-management issues and Aquahab's large ratio of part-time employees to full-time employees), orally terminated its client services contract with Aquahab. On November 6, 2000 Aquahab sent a certified letter to ProLease Atlantic confirming the termination of the contract, but requesting that ProLease Atlantic process its payroll until December 16, 2000. On November 29, 2000, Prolease Atlantic, unaware of the November 6, 2000 letter, sent a letter to Aquahab terminating their contract effective November 15, 2000 (thereby memorializing the earlier

---

[7] Paragraph 2(f) of the Purchase Agreement provides in relevant part:

> On or before the Recalculation Date . . . [Prolease Atlantic] shall deal with the client contracts . . . using the same commercially reasonable business practices as it has used in the past with respect to its own client contracts (i.e., [Prolease Atlantic] shall not wilfully and purposefully terminate any client contracts without cause solely to obtain a reduction in the amount of the Promissory Note, but shall have the right to terminate client contracts . . . for the same reason that it terminates its own client contracts (e.g., default by a client under a contract, and any risk management issues (credit risk, workmen's comp risk, unemployment risk, etc.)).

oral termination). On December 4, 2000, ProLease Atlantic first became aware of Aquahab's request in its November 6, 2000 letter, and by letter agreement dated December 5, 2000, agreed, as an accommodation to Aquahab, to process its payroll until December 31, 2000.

These undisputed facts plainly demonstrate that as of the Recalculation Date (November 28, 2000), Aquahab was not a client of ProLease Atlantic. The original contract was terminated effective November 15, 2000. Although ProLease Atlantic agreed to accommodate Aquahab's request to process payroll until the end of the year, this letter agreement was consummated on December 5, 2000, after the Recalculation Date.

The majority sees "no basis" to exclude clients that were terminated prior to the Recalculation Date, so long as Prolease Atlantic was processing payroll for the client at the time of the Recalculation Date. Maj. Op. at 8-10. Paragraph 2(f) of the Purchase Agreement, however, expressly and unambiguously contemplated that Prolease Atlantic might have a commercially reasonable need to terminate an unprofitable and risky client like Aquahab, and if that termination was not a disguised effort to reduce the money owed under the Promissory Note, it would eliminate the client's employees from the tally of Eligible Employees within the meaning of the Purchase Agreement. Because the District Court correctly found no evidence of record to indicate that Prolease Atlantic terminated Aquahab "without cause solely to obtain a reduction in the amount of the Promissory

25

Note," I would affirm its exclusion of Aquahab's 133 employees. The record is clear that Prolease Atlantic did not express a mere "intent" to terminate Aquahab; it in fact terminated Aquahab prior to the Recalculation Date, and only resumed processing Aquahab's payroll until the end of the year by a separate agreement entered <u>after</u> the Recalculation Date.

B.

The Exclusion of 135 Eligible Employees of Robinson-Pallet,
Trenton Corrugated, South Jersey Paper and Ventresca

Robinson-Pallet, Trenton Corrugated, South Jersey Paper and Ventresca each notified ProLease Atlantic prior to the Recalculation Date that they intended to terminate their contracts with ProLease Atlantic. The District Court held that the 135 Eligible Employees of these companies should be excluded from the Recalculation Formula.[8]

The present dispute is based on the phrase "on the Buyer's payroll as of the Recalculation Date" as used in § 2(d) of the Purchase Agreement. MASH contends that the plain meaning of the Purchase Agreement is clear, and that as of November 28, 2000 (the Recalculation Date), the employees of the Disputed Companies were irrefutably on

---

[8] It should be noted that during trial, Fried testified that at the time of the execution of the Purchase Agreement, Ventresca was actually a client of PLC and that between the time of the execution of the Purchase Agreement and the closing, MASH transferred Ventresca to MASH's payroll, without informing ProLease Atlantic. Because Ventresca was actually a client of PLC, and because ProLease Atlantic did not purchase any of the employees of PLC, the employees of Ventresca were never Eligible Employees. Thus, unlike the majority, <u>see</u> Maj. Op. at 8 n.2, I see no unresolved issue as to whether employees of Ventresca should be counted as Eligible Employees.

ProLease Atlantic's payroll, irrespective of whether they had voiced an intention to terminate their respective contracts prior to that date. ProLease Atlantic argues that the above-quoted phrase is ambiguous, and that the clear intention of the parties was to exclude employees from the Recalculation Formula who had voiced their intention, prior to the Recalculation Date, of terminating their relationship with ProLease Atlantic, even if the termination was to occur after the Recalculation Date.

The question of whether contractual language is clear or ambiguous is a legal determination subject to plenary review. See, e.g., Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 53 n.2 (3d Cir. 2001) (explaining that "if the district court engages in contract construction, we exercise plenary review"); see also First Union Nat'l Bank v. Steele Software Sys. Corp., 838 A.2d 404, 447 (Md. Ct. Spec. App. 2003) ("The determination whether contract language is ambiguous is a question of law for the court."). The Purchase Agreement provides that Maryland state law governs its terms.

"[A] written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible to more than one meaning. The determination of whether language is susceptible of more than one meaning includes a consideration of the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." Stevenson v. Branch Banking & Trust Corp., 861 A.2d 735, 753 (Md. Ct. Spec. App. 2004) (quotation marks and citation omitted). If a provision is deemed

27

ambiguous, the court shall determine the intent and purpose of the parties, and consider "the circumstances and conditions affecting the parties . . . and their subsequent conduct and construction of the contract." Anne Arundel County v. Crofton Corp., 410 A.2d 228, 232 (Md. 1980).

In support of ProLease Atlantic's argument that the unrebutted testimony at trial demonstrates that the phrase "on the Buyer's Payroll" is ambiguous, it points to the testimony of Charles Ehrig, its Chief Financial Officer, that the methodology used to calculate the number of employees on the payroll as of the Recalculation Date was to determine the number of employees who had been paid on any date during the month of November. According to ProLease Atlantic, if § 2(d) was strictly interpreted, and the appropriate calculation was the number of employees on payroll as of the specific Recalculation Date, then based on the payroll records, only three employees would be "on the Buyer's payroll" (i.e., the actual number of employees paid on November 28, 2000). Furthermore, Balaji Ramamoorthy, Prolease Atlantic's sole shareholder, testified that the payroll register inevitably included inactive and terminated employees who had long since ended their affiliation with ProLease Atlantic's clients. Therefore, to interpret the term "payroll" literally would improperly include these ineligible employees into the Recalculation Formula.

According to ProLease Atlantic, the intention of the parties was that the Reduction Formula exclude employees associated with clients who had stated their

intention to cease transacting business with ProLease Atlantic, even after the Recalculation Date. The District Court agreed, although it did not make any explicit finding that the provision was ambiguous.

ProLease Atlantic's interpretation is reasonable and consistent with the character and purpose of the contract. The Reduction Formula was primarily intended to protect ProLease Atlantic against 1) overstatements in the number of Eligible Employees at closing, and 2) client attrition during the 180-day period following the closing. Because the most valuable assets of Professional Employer Organizations are their client employees, it is reasonable to exclude those clients who will not remain on ProLease Atlantic's payroll after the Recalculation Date, so long as they have voiced their intention of terminating the contract before the Recalculation Date.

Unlike the majority, I would give due deference to the District Court's findings, and exclude all of the 268 disputed Employees from the Recalculation Formula. See Coca-Cola Bottling Co. v. Coca-Cola Co., 988 F.2d 386, 401 ("The intent of the parties to ambiguous provisions in a contract is, however, a question of fact that an appellate court can set aside only if it is clearly erroneous.").

**IV.**

Vogel and Fried argue that the evidence was insufficient to support the District Court's finding that they knew that any of the above listed representations were false, or that they were recklessly indifferent in making them.

29

It is well settled under Maryland law that fraudulent intent "may be inferred from the facts and circumstances accompanying the particular transaction . . . .   In other words, knowledge, like intent, is a state of mind generally to be inferred from the person's conduct viewed in light of all accompanying circumstances . . . . [T]he state of one's mind is always a question of fact, and being subjective in nature, proof thereof is seldom direct, but is usually inferred from proven circumstances." Pearson v. Maryland, 258 A.2d 917, 922 (Md. Ct. Spec. App. 1969); see also First Union Nat'l Bank, 838 A.2d at 440 (noting that "fraudulent intent can be inferred from circumstantial evidence").

The District Court concluded that:

> When one considers the extent of the inaccuracy in the eligible employee
> Client List the conclusion is inescapable that Counter Defendants had to
> have done that knowingly.  It is also clear that these
> misrepresentations/non-disclosures were reasonably relied upon by
> ProLease Atlantic in making its decision to purchase HRO's assets because
> they were the basis upon which the purchase price was computed.
> ProLease Atlantic was substantially damaged by its reliance upon Counter
> Defendants misrepresentations/non-disclosures because as a result of these
> ProLease Atlantic drastically overpaid under the Purchase Agreement.

App. at 30.

The District Court's conclusion should survive our review for clear error.  See Kool, Mann, Coffee & Co. v. Coffey, 300 F.3d 340, 359 (3d Cir. 2002).  As noted by the District Court, there was a huge disparity between the number of Eligible Employees represented at closing (3,037), and the number of Eligible Employees who were on the payroll as of the Recalculation Date (1,853).  Even excluding the 268 Eligible Employees

30

of the Disputed Companies, this leaves an overstatement of 916 Eligible Employees as of

the closing date—a figure which is not contested by Fried and Vogel.  This difference,

quite plainly, could not be accounted for by ordinary attrition.  Given that Fried and

Vogel were the only two shareholders of MASH, and thus intimately familiar with

MASH's day-to day business, the District Court did not clearly err by concluding that

these gross overstatements in the number of Eligible Employees were made with

knowledge of their falsity or reckless disregard for their truth.[9]  This conclusion is only

bolstered by the fact that MASH failed to provide any expert testimony to rebut that of

ProLease Atlantic, or to contest the validity of any of the other alleged false

representations identified in the Purchase Agreement.

## V.

For the reasons set forth above, I would affirm the District Court's fact findings

both with respect to the breach of contract and the fraud.

---

[9] Fried testified that there were 3,037 Eligible Employees as of the closing date.  Given the undisputed fact that this figure overstates the number of Eligible Employees on the Recalculation Date (only 180 days later) by at least 916 employees, one can logically deduce that the difference in these numbers can only be attributed to a misstatement of the number of employees on the client list. Given the surrounding circumstances, these statements could give rise to a finding of fraud and negligent misrepresentation.